## IN THE SUPREME COURT OF MISSISSIPPI
## NO. 1998-KA-01394-SCT

*ROBERT W. FLORENCE*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 07/31/1998 |
| TRIAL JUDGE: | HON. MIKE SMITH |
| COURT FROM WHICH APPEALED: | LINCOLN COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | EDWARD O'NEAL BENSON |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: DEIRDRE McCRORY |
| DISTRICT ATTORNEY: | DUNN O. LAMPTON |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 02/10/2000 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 3/2/2000 |

## BEFORE SULLIVAN, P.J., SMITH AND MILLS, JJ.

## SULLIVAN, PRESIDING JUSTICE, FOR THE COURT:

¶1. Robert W. Florence was convicted in the Circuit Court of Lincoln County on one count of sexual battery and one count of aggravated assault. On the sexual battery count, Florence was sentenced to a term of 30 years in the custody of the Mississippi Department of Corrections with ten years suspended. On the aggravated assault count, Florence was sentenced to a 20-year term with 15 years suspended. The sentences for both counts were to run concurrently. Florence was also ordered to pay court costs, a $20,000 fine, and all costs incurred by the victim for psychological treatment. Aggrieved by the circuit court's judgment, Florence timely perfects this appeal.

### STATEMENT OF THE FACTS AND CASE

¶2. On May 15, 1997, Robert Florence ("Florence") met Paul Jacobson ("Paul") at the Firestone store in Brookhaven where Paul worked. Paul plays the keyboard, and Florence him asked about receiving lessons. Later that same day, Florence called Paul and requested a lesson. Paul agreed, and Florence arrived at Paul's house around 6:00 p.m. that evening. During this lesson Paul mentioned he was looking for a new place to live. Florence, who lived alone, informed Paul he had been thinking about renting out part of his house and asked Paul if he was interested. Paul then rode with Florence to view the house.

¶3. Later that evening, Florence asked Paul if he would like to go to the Lady Luck Casino in Natchez. At first Paul refused, saying he had no money and was still wearing his work clothes. Florence kept insisting,

and Paul ultimately agreed to go after Florence offered $40 and a change of clothes. While driving to the casino, Florence "slapped" Paul on the leg and said, "hey, you my Bud, ain't you?" Paul testified Florence's gesture "kinda freaked me out." Florence and Paul arrived at the casino at approximately 10:30 p.m. and went their separate ways.

¶4. Todd Moody ("Moody") was a 20 year old chemical engineering major at Mississippi State University. About 11:30 p.m., on the night in question, Moody, who was home in Natchez, Mississippi, rode with two friends to the Lady Luck Casino. According to Moody's testimony, he and Florence first "struck up a conversation" at the roulette table. Moody then went to play blackjack. According to Moody, Florence showed up at the blackjack table, and they once again "struck up a conversation." While he was playing blackjack, Moody's two friends approached him and told him they were ready to leave. When Moody informed his friends he was not ready, Florence volunteered to give him a ride home.[1] Moody accepted Florence's offer and asked his friends to give him a ride home and back so he could get more money. His friends agreed, took Moody home and then brought Moody back to the casino approximately 30 to 45 minutes later. Upon returning, Moody testified he immediately found Florence to make sure he still had a ride home.

¶5. Later Paul found Florence and told him he was ready to leave. Florence was not ready yet and gave Paul the keys so he could go sleep in the truck. About an hour later, Florence asked Moody if he was ready to go and they left. Florence drove, Moody sat in the middle, and Paul sat on the passenger side of the truck. Both Moody and Paul testified that Florence said he was taking Paul home "because [Paul] was in a real hurry to get back to his house" and that he was coming back to Natchez as soon as he dropped Paul off.[2] Moody agreed to ride with Florence since he "wasn't in a hurry to get back to his house." During the ride, Florence "patted" Moody on the knee once, but Moody testified he "didn't think anything about it."

¶6. Florence, Moody, and Paul stopped first at Florence's house so Paul could change back into his own clothes. Florence and Moody then dropped Paul off at his house in Wesson. Although Moody testified the original plan was to go straight back to the casino, Florence told Moody "he wanted to take a nap" because he was "real tired" and go back to Natchez later on that morning.[3] Moody said "that would be fine," and they returned to Florence's house.

¶7. Upon returning to Florence's house, Florence showed Moody the bed where he could sleep.[4] Moody testified that he took his pants off and got into bed wearing only a "tee shirt and boxers."[5] Moody further testified that Florence kept coming in and out of his room every few minutes. After about 10 minutes, Florence went into the bedroom and lay down beside Moody. Moody was not asleep, but he had his eyes closed. Moody next "felt something" like a knife being pressed against his throat. Moody testified that Florence then grabbed Moody's hand and "put it in his groin area." He further told Moody "your better play with it." When Moody did not respond immediately, Florence pushed the knife harder against Moody's throat, and Moody complied. A few minutes later, Florence started grabbing Moody's head and "pushing it down to his groin." Florence then said, "You know what to do now." Florence was wearing black or dark blue bikini underwear and still had the knife. Fearful, Moody involuntarily began "giving him oral sex." Moody further described his escape as follows:

> Well, for, I don't know again how long that went on. It seemed like forever, but a few minutes, I guess. He started trying to pull his underwear down and I had the idea pop in my head that I'd pull them down for him, cause that would get me off of him for a few minutes, or a few seconds, at least.

And I started to pull them down, and as I did, I was inching myself to the end of the bed. And when they got about to his knees where I figured I was far enough from the knife and I'd have a few seconds head start, I just jumped off the bed and took off running.[(6)]

Wearing only his tee shirt and boxers, Moody ran to Bonita Bennett's house where a small boy answered the door. Moody told Bennett someone was "after" him and asked her to call the police. Moody then heard Florence's "truck crank up" and begged Bennett to let him in. She refused but told him he could hide behind her house. According to Bennett's testimony, she heard Florence and Moody exchange words when Florence drove by. Moody then hid behind Bennett's house for 10 or 15 minutes, until he realized she had not called the police. Moody was "humiliated standing out in [his] underwear knocking on people's doors" and decided to go back to Florence's house to retrieve his clothes. Knowing Florence was gone, Moody entered Florence's home through a window, got his clothes, and exited through the front door.

¶8. Moody then knocked on another door. A man answered who provided a phone and dialed the police. Lance Falvey, a road deputy with the Lincoln County Sheriff's Department, was the first officer to respond to the call. He described Moody as "extremely excited" and "very nervous." Falvey further stated, "you could tell something happened to him." Moody described what had happened, including giving a description of the knife and the underwear Florence was wearing. On their way to the station, Falvey advised another deputy, Mahondus Bryce, to secure Florence's residence. When Falvey arrived back at the residence, Bryce advised him that Florence had started to leave, saw him, turned around, and drove his truck to the edge of the woods. When the deputies approached Florence's truck, Falvey noticed a pair of bare feet sticking out from underneath the truck. Falvey also noticed a .22 rifle lying close to Florence underneath the truck. Both deputies drew their weapons and ordered Florence out from underneath the truck. Florence was wearing only a pair of blue jeans. When asked what he was doing under the truck, Florence replied, "I was changing my oil." Deputy Falvey found it "very odd that someone would be underneath the truck changing the oil when there was no tools, no oil underneath the truck, no pan to catch the oil in, nothing whatsoever that would indicate that anyone was changing oil in a vehicle." Florence then agreed to accompany the deputies to the Sheriff's's office for questioning.

¶9. At the Sheriff's office, Florence told deputies that "nothing happened." In fact, Florence never alleged that Moody was the aggressor until trial. A search warrant was executed, and both the knife and underwear were found in the bedroom of Florence's house. Police also found a filing cabinet which contained a videotape and magazines of "male on male sexual endeavors," along with some heterosexual magazines. Florence admits that the homosexual magazines and tape came in the mail and were addressed to him. Florence, however, denies that he ordered those materials. Florence insists those tapes belong to his cousin, Greg Curtis. Curtis testified that he had ordered some "adult sex acts" but denied ever ordering "homosexual tapes."

¶10. The police did not fingerprint the knife. Additionally, no assault kit was performed on Moody. He sought no medical attention after the incident and no marks, bruises, cuts or scars were found on Moody's neck from the knife. Criminal Investigator, Bruce Jackson, testified that his reason for doing no testing was based on Moody's statement that Florence did not ejaculate. Both Moody and Florence maintain that they are heterosexual and have no homosexual or bisexual tendencies.

## STATEMENT OF LAW

### I.

## WHETHER THE JURY VERDICT WAS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE

¶11. A motion for a new trial simply challenges the weight of the evidence. "We will not order a new trial unless convinced that the verdict is so contrary to the overwhelming weight of evidence that to allow it to stand, would be to sanction an unconscionable injustice." *Groseclose v. State*, 440 So. 2d 297, 300 (Miss. 1993). Furthermore, "a reviewing court cannot and need not determine with exactitude which witness or what testimony the jury believed or disbelieved in arriving at its verdict." *Groseclose* at 300. "It is enough to say that the conflicting evidence presented a factual dispute for jury resolution." *Id.*

¶12. Florence asserts that the evidence presented in this case does not support a verdict of guilty beyond a reasonable doubt. This Court disagrees and finds Florence's assertion to be without merit. In the present case, the victim's demeanor after the incident was described as that of nervousness and excitement. Deputy Falvey even testified "you could tell something had happened to him." Likewise, the jury heard impeachment testimony wherein Florence admitted he had been charged several years earlier with assault of a male involving a knife. Furthermore, magazines were found at Florence's house depicting "male on male sexual endeavors."

¶13. Factual disputes are resolved by a jury and do not mandate a new trial. *McNeal v. State*, 617 So. 2d 999, 1009 (Miss. 1993). The evidence and testimony presented could have led a reasonable jury to find Florence guilty of the crimes charged. No unconscionable injustice results by allowing this verdict to stand. Accordingly, this Court finds the jury's verdict was not against the overwhelming weight of the evidence. Therefore, Florence's assertion is without merit.

## II.

## WHETHER THE COURT ERRED IN ALLOWING THE STATE TO ADMIT EXTRINSIC EVIDENCE OF THE DEFENDANT'S DISPOSITION TO ENGAGE IN HOMOSEXUAL CONDUCT

¶14. Florence filed a motion in limine to suppress the admission into evidence of several magazines and tapes that were taken from a filing cabinet in his home. Florence specifically asserted that the magazines and tapes were being introduced solely to prejudice the jury against him and had no relevance to the res gestae of the crime. The State, however, argued that the magazines and tapes were not being introduced as part of the res gestae, but rather to show that Florence had homosexual or bisexual tendencies.

¶15. During the hearing on the motion in limine, Florence cited *Brown v. State*, 534 So. 2d 1019 (Miss. 1987) and *Collins v. State*, 513 So. 2d 877 (Miss. 1987), in support of his argument that the magazines and tapes should be excluded as evidence. Based on those two cases, Florence argued that the publications were irrelevant because they were not part of the res gestae. The State responded as follows:

> ... the question in this case, the whole issue in this case here, from my understanding of the opening statement made by defense counsel, Your Honor, was that the State is saying that the defendant is the one who initiated the homosexual act. The defense is saying that the victim in this case is the one who

initiated the homosexual act. So the issue is who has those type [sic] of tendencies. And with that question coming up, the most important issue is going to be the intent of the victim or the defendant. And the State, of course, seized, I believe, three video tapes or four video tapes. We are going to also try to introduce one of those showing homosexual activity between men and three magazines involving homosexual activity between men.

In *Brown* and *Collins*, the State was trying to admit magazines as part of the res gestae of the crime. In both cases, the trial court excluded those magazines which were not shown to the victim, and therefore not part of the res gestae.

¶16. In the present case, the trial judge held *Brown* and *Collins* did not apply and were distinguishable since the State never sought admission of the evidence by claiming the magazines and tapes were part of the crime itself. Rather, the State only sought to show that Florence had homosexual tendencies, a fact which the Florence's attorney affirmatively denied during opening statements, as follows:

There is no evidence to prove a sexual battery. And the reason that it can't be proved is because there is no evidence to draw that conclusion. **You will be able to determine that Mr. Florence not only [sic] is he not guilty; be he is not gay, he is not homosexual. Whatever connotations we want to put on the word, he is a man who honored his manhood and dared not allow anyone to hold it cheap** ... And Mr. Moody, this stranger, after Mr. Florence was asleep, attempted to take advantage of his drunkenness ... Attempted to rob him of his manhood.

(emphasis added). Not only did Florence deny he was homosexual in his opening statement, but he alleged that he, and not Moody, was the victim.

¶17. The trial court ultimately concluded that Florence "opened the door" during opening statements and put the question of Florence's potential homosexuality before the jury. This Court agrees and finds the trial court did not err by admitting the magazines and tapes into evidence.

¶18. Furthermore, the magazines and tapes were, in fact, relevant evidence. "Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Kolb v. State*, 542 So. 2d 265, 269 (Miss. 1989)(quoting M.R.E. 401). In *Kolb*, a male defendant was convicted of sexual battery of a minor victim. During its case in chief, the State introduced letters written by the defendant which alluded to his homosexuality. The defendant objected based on relevance, and this Court held as follows:

The question is whether these letters had a tendency to make any fact that was of consequence to the determination of the outcome more probable. Put simply, did these letters make it more probable that Kolb had committed the act with which he was charged. **Because the vast majority of the human race does not have sexual urges toward small children such as those manifested by Kolb, and sexual acts such as those with which he was charged are repugnant and difficult to believe, when any person is charged with such conduct it is relevant that the individual did have those sexually deviant tendencies. The letters were relevant to as tending to show Kolb had such urges conjoined with the issue of whether he in fact engaged in the act which with he was charged.** The weight to be given the letters is entirely up to the jury.

*Kolb* at 269 (emphasis added). In the present case, the magazines were more probative than prejudicial.

The defense challenged Florence's capacity to commit a male-on-male sexual assault, something the vast majority of the population finds hard to conceive or envision. The presence of sexually explicit materials, depicting male homosexuality, in Florence's house has some tendency to make his homosexual tendencies more probable. Accordingly, this Court finds Florence "opened the door" during opening statements by denying any homosexual tendencies and that the introduction of extrinsic evidence in this case was relevant and therefore not unfairly prejudicial.

## III.

### WHETHER THE COURT ERRED IN REQUIRING THE APPELLANT TO PAY FOR THE VICTIM'S PSYCHOLOGICAL TREATMENT WHEN NO EVIDENCE WAS INTRODUCED PROVING THE VICTIM ACTUALLY SOUGHT MEDICAL TREATMENT

¶19. By the authority set forth in Miss. Code Ann. § 99-37-3 (1994), the trial court ordered Florence to pay "all costs incurred by the victim for psychological treatment." Florence asserts that the trial court's decision requiring him to pay for damages constitutes an abuse of discretion and violated his due process right as guaranteed by the Fourteenth Amendment to the United States Constitution. However, Florence failed to challenge this order in his motion for j.n.o.v./new trial and thereby failed to afford the trial court an opportunity to rule on this issue. "It is well established that this Court will not consider issues which were not raised in the trial court." *Crenshaw v. State*, 520 So.2d 131, 134 (Miss. 1988). Furthermore, "a trial judge cannot be put in error on a matter which was not presented to him for decision." *Crenshaw* at 134-35. Therefore, this issue is not properly before us for decision.

## IV.

### WHETHER THE COURT ERRED IN OVERRULING THE DEFENDANT'S MOTION FOR A DIRECTED VERDICT

¶20. Florence asserts that there was insufficient evidence to support the verdict and that the Court improperly denied his motion for a directed verdict and his motion for a j.n.o.v. The applicable standard of review is as follows:

> [W]e must, with respect to each element of the offense, consider all of the evidence - not just the evidence which supports the case for prosecution - in the light most favorable to the verdict. The credible evidence which is consistent with the guilt must be accepted as true. The prosecution must be given the benefit of all favorable inferences that may reasonably be drawn from the evidence. Matters regarding the weight and credibility to be accorded the evidence are to be resolved by the jury. We may reverse only where, with respect to one or more of the elements of the offense charged, the evidence so considered is such that reasonable and fair-minded jurors could only find the accused not guilty.

*Gleeton v. State*, 716 So. 2d 1083, 1087 (Miss. 1998)(quoting *Wetz v. State*, 503 So. 2d 803, 808 (Miss. 1987)(citations omitted)).

¶21. In the present case, when Florence presented evidence in his own behalf he waived his own objection to the denial of the motion for a directed verdict at the end of the State's case. *Weeks v. State*, 493 So.2d 1280, 1282 (Miss. 1986); *see Wetz v. State*, 503 So. 2d 803, 807 (Miss. 1987). Likewise, this Court finds the trial court properly overruled Florence's motion for a j.n.o.v. Considering all of the evidence, in the

light most favorable to the State, a reasonable and fair-minded jury could have found Florence guilty of the crimes charged.

¶22. The jury heard the testimony of the victim, who described the encounter, including the weapon used and the underwear Florence was wearing. The jury also heard testimony by neighbors and the police who described Moody's demeanor immediately after the assault as being excited and nervous. Likewise, the jury heard testimony by officers who described Florence's behavior immediately after the incident as being strange and unusual. Additionally, the jury heard impeachment testimony whereby Florence admitted he had been charged several years earlier with assault using a knife. Furthermore, magazines and tapes were found at Florence's house depicting male-on-male sexual endeavors.

¶23. "[When] there is substantial evidence consistent with the verdict, evidence which is of such weight and quality that, keeping the burden of proof of beyond a reasonable doubt in mind, 'fair-minded' [jurors] in the exercise of impartial judgment might reach different conclusions, the jury's verdict should be allowed to stand."*Ashford v. State*, 583 So. 2d 1279, 1281 (Miss. 1991). Sufficient evidence was introduced whereby a reasonable jury could have found Florence guilty of the crime charged. Therefore, the trial court did not err by denying Florence's motion for a j.n.o.v.

## CONCLUSION

¶24. In the present case, sufficient evidence was presented such that a reasonable and fair-minded juror could have found Florence guilty. The weight of the evidence, including the testimony of the victim, along with the testimony of officers and neighbors, supports the conviction. Furthermore, the trial court did not err by admitting into evidence the homosexual tapes and magazines found at Florence's residence to rebut Florence's opening statement, wherein he denied having homosexual tendencies. Thus, the trial court did not err in denying Florence's motion for a j.n.o.v. or a new trial. Therefore, the judgment of the Circuit Court of Lincoln County is affirmed.

¶25. **COUNT ONE: CONVICTION OF SEXUAL BATTERY AND SENTENCE OF THIRTY YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS WITH TEN YEARS SUSPENDED AFFIRMED.**

**COUNT TWO: CONVICTION OF AGGRAVATED ASSAULT AND SENTENCE OF TWENTY YEARS WITH FIFTEEN YEARS SUSPENDED AFFIRMED. SENTENCE IN COUNT II TO RUN CONCURRENT WITH SENTENCE IN COUNT I. APPELLANT SHALL PAY A $20,000.00 FINE, COURT COSTS AND ALL OTHER COSTS.**

**PRATHER, C.J., PITTMAN, P.J., BANKS, McRAE, SMITH, MILLS, WALLER AND COBB, JJ., CONCUR.**

1. According to Florence's testimony, however, Moody asked Florence if he would give him a ride home. Florence agreed, but told Moody he did not know when he would be back and that it would be later on that day.

2. According to Florence's testimony, however, when Moody asked Florence for a ride, he informed him that he was probably coming "back [to the casino] later on that day", but "not right off."

3. According to Florence's testimony, however, he informed Moody that he had an appointment to

refinance his house with the bank at 9:00 a.m. and would not return to the casino in Natchez until later that day.

4. There is only one bed in the house.

5. According to Florence's testimony, however, Florence offered Moody the couch, and Florence slept in the bed.

6. Florence's testimony was quite different. Florence testified that he fell asleep in his bed and awoke to find Moody trying to remove his underwear. Moody had the underwear down to his knees. At this point, Florence was "scared" and asked "what the hell he was doing?" Moody then took off running and Florence grabbed his knife (which was beside his bed). According to Florence, he left his underwear on the floor beside the bed, put on his pants, placed the knife on the side of the bed, and went to look for Moody.