995 So.2d 827 (2008)
Omar KAZERY a/k/a Samuel D. Kazery, Appellant,
v.
STATE of Mississippi, Appellee.
No. 2006-KA-00390-COA.
Court of Appeals of Mississippi.
August 19, 2008.
Rehearing Denied December 2, 2008.
William R. Labarre, Virginia Lynn Watkins, Brenda Jackson Patterson, attorneys for appellant.
Office of the Attorney General by Jeffrey A. Klingfuss, attorney for appellee.
Before MYERS, P.J., IRVING and CARLTON, JJ.
CARLTON, J., for the Court.
¶ 1. Omar Kazery was convicted of felony child abuse in the Circuit Court of Hinds County. He was sentenced to a term of twenty years in the custody of the Mississippi Department of Corrections, with fifteen years suspended and four years of post-release supervision. The trial court denied Kazery's post-trial motions. *828 Aggrieved, Kazery appeals and challenges the weight and sufficiency of the evidence. We find no error and affirm.

FACTS
¶ 2. On May 29, 2002, Leah McPhearson brought her three-year-old daughter, Shelby[1], along with her to Kazery's trailer for a weekend visit. At the time, McPhearson and Kazery had been dating for approximately two months; McPherson had been living with Kazery in the trailer for approximately one month. Kazery's five-year-old son, Austin, and McPhearson's cousin, Jason Scott, were also present. Early that evening, Shelby and Austin broke a "mindteaser" game while they were playing. The game belonged to Kazery, who became agitated and inquired into what happened. Each child blamed the other. As a result of the children's dishonesty, they were sent to their room.[2] Shortly thereafter, McPhearson's sister, Lisa Scott, and McPhearson's aunt, Allison Thompson, arrived at the trailer. Shelby and Austin heard their voices and got out of bed. After a short visit, Lisa and Allison left, and the children were returned to bed at approximately 7:30 p.m. McPhearson, Kazery, and Scott then began a night of drinking and intravenous drug use that continued until approximately 2:00 a.m. when they went to bed.
¶ 3. McPhearson awoke the following afternoon at approximately 1:00 p.m. She went into Shelby's bedroom and found her still in the bed. McPhearson asked Shelby if she was sick, and Shelby said that she was. McPhearson noticed a bald spot on her head. She also noticed swelling on Shelby's forehead. McPhearson then woke Kazery and told him that something was wrong. According to McPhearson's trial testimony, Kazery told her that he got up earlier that morning and found Shelby in the bathroom, that she had "pooped in her pants," and that he put her in the bathtub and cleaned her up. Kazery suggested that Shelby had probably been bitten by a spider. McPhearson gave Shelby Benadryl; however, the swelling worsened over the next hour. As a result, McPhearson had Kazery drop her and Shelby off at the hospital.
¶ 4. Shelby was examined by Dr. Catherine Faulk at the University Medical Center (UMC). Dr. Faulk noticed multiple bruises on Shelby's forehead, ears, left eye, and neck. She also noticed the bald spot on Shelby's head and determined that her hair had been yanked out. Dr. Faulk concluded that the injuries were the result of child abuse and notified the Department of Human Services (DHS) and the Jackson Police Department (JPD). She also took pictures of Shelby's injuries.
¶ 5. Jennifer Hart, a DHS social worker, was called to UMC to investigate the reported abuse. Hart noticed that Shelby was "very withdrawn." She spoke with Shelby alone and asked her what happened. Shelby responded, "Omar pulled my hair." Hart placed Shelby in the temporary custody of her maternal grandmother, Helen Peavey.
¶ 6. Carnell Kitchens, a JPD detective, was also called to UMC to investigate. He too interviewed Shelby alone. Shelby identified her attacker as her imaginary friend, "Charlie Brown." Detective Kitchens asked Shelby if she knew the difference between real and make believe; however, she walked out of the room in search *829 of her mother without answering, thus concluding the interview.
¶ 7. Thereafter, Shelby was referred to the Children's Advocacy Center where Brian Erwin, a forensic interviewer, talked with her and recorded the conversation. At trial, Erwin testified that he had trouble understanding Shelby, and he experienced some confusion during the interview concerning who Shelby identified as her attacker. Shelby once stated a name that started with the letter "J." Erwin understood this to be Jason Scott and continued the interview under the impression that Scott was the attacker identified by Shelby. However, after reviewing the videotape of the interview, Erwin realized that Shelby actually identified Kazery as her attacker. To this end, Erwin specifically asked Shelby at one point if Scott hit her, and she responded, "No, him [sic] didn't." Additionally, Shelby stated during the interview that Omar pulled her hair.
¶ 8. Shelby was six years old at the time of trial. She testified that she did not like Kazery "[b]ecause he pulled my hair out." Beyond this, Shelby recalled very little about the night in question. At the close of the State's case-in-chief, Kazery made a motion for a directed verdict, which the trial court denied. The jury found Kazery guilty of felony child abuse pursuant to Mississippi Code Annotated section 97-5-39(2) (1989). The trial court denied Kazery's motion for judgment notwithstanding the verdict or, in the alternative, for a new trial. Aggrieved, Kazery now appeals.

DISCUSSION

Sufficiency and Weight of the Evidence
¶ 9. Kazery challenges the evidence as it relates to his identity as Shelby's attacker. He argues that the evidence was insufficient to prove that he was the one who inflicted the injuries upon Shelby and also claims that such a finding was against the overwhelming weight of the evidence. We disagree.
¶ 10. In reviewing a challenge to the weight of the evidence, we accept all of the evidence supporting the verdict as true. Hodges v. State, 906 So.2d 23, 26(11) (Miss. Ct.App.2004) (citing Swann v. State, 806 So.2d 1111, 1117(25) (Miss.2002)). On appeal, "we will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." Bush v. State, 895 So.2d 836, 844(18) (Miss.2005) (citing Herring v. State, 691 So.2d 948, 957 (Miss.1997)).
¶ 11. In reviewing a challenge to the sufficiency of the evidence, "this Court considers all of the evidence in the light most favorable to the State and gives the State the benefit of all favorable inferences that may reasonably be drawn from the evidence." Seeling v. State, 844 So.2d 439, 443(8) (Miss.2003). "We may reverse only where, with respect to one or more of the elements of the offense charged, the evidence so considered is such that reasonable and fair-minded jurors could only find the accused not guilty." Gleeton v. State, 716 So.2d 1083, 1087(14) (Miss.1998) (quoting Wetz v. State, 503 So.2d 803, 808 (Miss. 1987)).
¶ 12. We find that there was sufficient evidence to establish that Kazery was Shelby's attacker. Kazery was in the trailer at all times during which the abuse might have happened. There was evidence that he encountered Shelby in the bathroom shortly before Shelby's injuries were discovered. Most significantly, Shelby identified Kazery as her attacker during Hart's interview, during Erwin's forensic interview, and again while testifying at *830 trial.[3] Shelby once identified her attacker as "Charlie Brown," and apparently mentioned Scott during the forensic interview; thus, there is, to some extent, a conflict in the evidence as to her attacker's identity. However, it is well settled that "when the evidence is conflicting, the jury will be the sole judge of the credibility of witnesses and the weight and worth of their testimony." Gathright v. State, 380 So.2d 1276, 1278 (Miss.1980) (citations omitted).
¶ 13. In the instant case, as in most trials, the jury was presented with all of the evidence, some of which was conflicting. Unfortunately for Kazery, the jury in carrying out its function resolved the conflicting evidence against him, concluded that he was Shelby's attacker, and returned a verdict of guilty. Considering the evidence in the light most favorable to that verdict, we find that allowing the verdict to stand would not sanction an unconscionable injustice. Further, we find that the evidence was not such that reasonable jurors could have only returned a verdict of not guilty. Accordingly, we find no error and affirm.
¶ 14. THE JUDGMENT OF THE CIRCUIT COURT OF HINDS COUNTY OF CONVICTION OF FELONY CHILD ABUSE AND SENTENCE OF TWENTY YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITH FIFTEEN YEARS SUSPENDED AND FOUR YEARS OF POST-RELEASE SUPERVISION, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO HINDS COUNTY.
*831 KING, C.J., LEE AND MYERS, P.JJ., IRVING, CHANDLER, BARNES, ISHEE AND ROBERTS, JJ., CONCUR. GRIFFIS, J., CONCURS IN RESULT ONLY.
NOTES
[1] Shelby is a fictitious name that we will use in place of the minor victim's real name in an effort to protect her identity.
[2] Shelby and Austin shared a room that contained a bunk-bed.
[3] At this point, we pause to point out potential problems resulting from an uncoordinated investigation such as that conducted in the instant case. After the traumatic instance of her abuse, Shelby was subjected to the increased stress of repeated investigations conducted by various professionals. After Dr. Faulk examined her, Shelby was interviewed by (1) Ms. Hart, a DHS social worker; (2) Detective Kitchens, with the JPD, and (3) Mr. Erwin, a forensic interviewer with the Children's Advocacy Center.

Dr. Catherine Dixon, the Clinical Director of the Mississippi Children's Advocacy Center in Jackson, explains in her well-informed and well-reasoned law review article that such an uncoordinated response subjects the already-traumatized child to additional "system-induced trauma" and also greatly compromises the resulting civil and/or criminal proceedings, in which often times the only witnesses are the abused child and the perpetrator. See Catherine Dixon, Best Practices in the Response to Child Abuse, 25 Miss. C.L.Rev. 73, 81-83 (2005). As Dr. Dixon describes:
When children are interviewed multiple times by multiple interviewers, the risk of contamination is great. This is especially true when the interviews are conducted by untrained interviewers using inappropriate interview techniques. Interviewers may ask leading questions or interview children without regard for their developmental needs. Ultimately, children who are interviewed multiple times may begin to recant, if only to stop the frightening, overwhelming process of the investigation. By coordinating the multi-agency response to child abuse, and by designating a forensic interviewer, children are spared additional stress and better information is obtained, inevitably leading to better decision-making. And better decision-making positively impacts child protection and prosecution outcomes.
Id. at 83.
The instant case illustrates the need for a coordinated multi-agency response as suggested by Dr. Dixon, as well as the problems she describes that may result from an uncoordinated response, such as that conducted in the instant case. For instance, when Shelby was interviewed a second time by Detective Kitchens, she identified her attacker as "Charlie Brown" and then walked out of the room. Although she did not technically recant on her earlier statement that Kazery pulled her hair, this conduct is an example of the risk of contamination that Dr. Dixon warns of. Ultimately, the instant case hinged on Shelby's trial testimony instead of her pretrial statement; however, the potential for contamination and additional trauma to the child should be apparent.