# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 96-KA-01392-SCT

*CLAUDE GLEETON, III a/k/a*

*CLAUDE EUGENE GLEETON, III*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 10/01/96 |
| TRIAL JUDGE: | HON. GEORGE C. CARLSON JR. |
| COURT FROM WHICH APPEALED: | PANOLA COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANTS: | DAVID CLAY VANDERBURG |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JEAN SMITH VAUGHAN |
| DISTRICT ATTORNEY: | ROBERT L. WILLIAMS |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 6/25/98 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 7/16/98 |

## BEFORE SULLIVAN, P.J., ROBERTS AND WALLER, JJ.

### SULLIVAN, PRESIDING JUSTICE, FOR THE COURT:

¶1. Claude Gleeton, III, and Anthony Cathey were indicted by the Panola County Grand Jury during the February 1996, Session for conspiracy to commit capital murder and capital murder in the killing of Charles Gray on or about December 8, 1995. Upon Gleeton's motion, Circuit Court Judge George C. Carlson, Jr., ordered that the cases against Gleeton and Cathey be severed. Cathey pled guilty to the charges in exchange for the State's agreement not to seek the death penalty and was sentenced to life imprisonment without possibility of parole. The court called Cathey as a witness at Gleeton's trial held on September 23, 1996, through October 1, 1996. The jury convicted Gleeton of capital murder and conspiracy to commit capital murder and sentenced him to serve a life sentence without possibility of parole for the capital murder conviction. On November 25, 1996, Judge Carlson denied Gleeton's motion for a new trial or for J.N.O.V. The court sentenced Gleeton to serve twenty years in the custody of the Mississippi Department of Corrections on the conspiracy conviction, to run concurrently with the life sentence, in an order dated November 29, 1996. Gleeton appeals to this

Court and assigns as error the court's calling Cathey as a witness and the admission of Cathey's prior testimony, and denial of his motions for a polygraph exam, for a directed verdict, and for a new trial or J.N.O.V. We find no merit in any of Gleeton's claims and therefore affirm his conviction and sentence.

## STATEMENT OF THE FACTS

¶2. On December 7, 1995, Anthony Cathey and Claude Gleeton, III decided to drive Gleeton's father's truck to a club in Charleston. They spent the night at the Curtis home in Charleston. Mike Curtis testified that Cathey had a gun, which Cathey said belonged to Gleeton, and the men were all passing it around looking at the gun that night at his mother's house. The gun was identified as a .40 caliber Glock, later recovered from Gleeton's father by Investigator Walter Davis with the Mississippi Highway Patrol and delivered to the Mississippi Crime Lab. The next morning Cathey, Gleeton, and Mike Curtis left to go riding in Gleeton's truck. They drove to Oakland and spent the day drinking at Reese Taylor's house and driving around in the truck. The men stopped at Terry McBrayer's store a couple of times, making McBrayer nervous. They left the store after Gleeton asked McBrayer why his two children were at the store instead of in school that day. At that point, McBrayer phoned the sheriff's office to report his suspicion that the men had intended to rob his store. Gleeton and Cathey drove Curtis back to Charleston and dropped him off at his mother's house.

¶3. At trial, Cathey testified that he told Gleeton to drive back towards Batesville, going through the Red Hill community. They ended up by Chuck Gray's store, driving past it two times before finally pulling into the parking lot. Cathey stated that he took the gun from underneath the seat of Gleeton's truck, and while Gleeton pumped gas, Cathey went into the store to ask Gray if he had a bathroom. Gray told him he didn't, so Cathey left, but returned a second time intending to rob the store. Cathey shot Gray in his right eye as he sat in a chair behind the counter, then shot Gray two more times in the back of the head while he lay on the floor. Cathey unplugged the cash register, took the money, and took Gray's gun from behind the counter. Cathey returned to the truck, where he put the gun back under the dashboard, and Gleeton drove Cathey home.

¶4. According to Cathey's testimony at trial, Gleeton had nothing to do with Chuck Gray's murder and had no knowledge that Cathey went into the store with the gun. Cathey also claimed that he and Curtis had discussed robbing someone that day, and in fact decided against robbing McBrayer since his children were in the store, but that Gleeton was not involved in the conversation. However, Curtis testified that Cathey brought up the idea of robbing someone, saying that he wanted to "pop" or "get somebody." He also testified that he understood Gleeton to be in agreement with Cathey about robbing someone, because Gleeton was talking about needing money in response to Cathey's suggestion. Curtis had previously informed investigators that both Cathey and Gleeton were talking about robbing someone that day.

¶5. Cathey kept Gray's gun and sold it to James Fox for $75 the day after Gray's murder. Panola County Sheriff David Bryan received a tip from a confidential source that James Fox had Gray's gun. Fox turned the gun over to Deputy Sheriff James Rudd, informing him that Cathey had sold him the gun, so Rudd picked Cathey up at his mother's house on December 14, 1995. Cathey gave a taped statement to Rudd, Sheriff Bryan, and Investigator Walter Davis that day. In his statement at the sheriff's office, Cathey said that it was Gleeton's idea to go to Chuck Gray's store, and that they both

went in and Gleeton shot Gray. Cathey stated that he started to open the cash register, but changed his mind, so Gleeton took the money. According to this first statement, Gleeton was also the one who took Gray's gun, but Cathey said that he did pick it up at first. The two split up the money in Gleeton's truck on the way back to Cathey's mother's house.

¶6. Gleeton's father, having been approached by investigators looking for Gleeton, brought Gleeton to the sheriff's office on December 14. Gleeton told the officers that he was in Holly Springs all day on December 8 and denied any involvement in Gray's murder. Cathey was brought into the room with Gleeton and confronted Gleeton, accusing him of shooting Gray, but Gleeton still denied it.

¶7. At his plea hearing on May 31, 1996, Cathey gave essentially the same testimony as his statement at the sheriff's office, identifying Gleeton as the trigger man. At his sentencing hearing, Cathey similarly testified that Gleeton was the shooter, and that he and Gleeton had discussed robbing a drug dealer in Charleston. He also admitted that he, Gleeton, and Curtis decided not to rob McBrayer's store, because McBrayer's two children were there. However, Cathey denied having specifically discussed robbing Gray's store with Gleeton, claiming that he didn't know that Gleeton planned to rob Gray.

¶8. At trial, Cathey attributed the inconsistencies in his prior statements and his testimony at trial to his desire to keep from getting caught and to avoid the death penalty. He also claimed that when he gave his statement to the sheriff, he'd been drinking and smoking marijuana. However, Sheriff Bryan and Deputy Sheriffs James Rudd and Craig Sheley testified that Cathey did not appear to be under the influence of drugs or alcohol when he gave his statement. Dr. Steven Hayne, the pathologist who performed the autopsy on Gray, testified that the cause of death was three gunshot wounds to the head, and the manner of death was homicide.

¶9. Investigators recovered two projectiles from the floor under Gray's body and one from a security box on the wall behind the chair where Gray would have been sitting when he was shot. They also recovered three casings from the crime scene. The projectiles and casings were submitted to the Mississippi Crime Lab for analysis. Steve Byrd, a forensic scientist specializing in firearm evidence examinations at the Mississippi Crime Lab, testified that his tests revealed that the casings recovered from the crime scene were fired from the Glock .40 recovered from Gleeton's father by Investigator Davis. Byrd also found that the projectiles bore characteristics common to the gun, making it a possible source of the projectiles, but he could not say that they were fired from that particular gun to the exclusion of all others.

¶10. Based upon the above testimony, the jury found Gleeton guilty of both capital murder and conspiracy to commit capital murder. Gleeton was sentenced to serve a life sentence without possibility of parole for the capital murder conviction, and twenty years for the conspiracy conviction, to run concurrently with the life sentence.

## STATEMENT OF THE LAW

### I.

### THE COURT ERRED IN DENYING DEFENDANT'S MOTION FOR A POLYGRAPH EXAMINATION OF DEFENDANT.

**Standard of Review**

¶11. The standard of review applied to the trial court's refusal to provide the defendant with funds for an expert "is de novo, since the trial court's refusal was based upon law. The general standard of review for a trial court's refusal to provide an expert witness is substantial need for that expert." *Holland v. State*, 705 So.2d 307, 329 (Miss. 1997) (internal citations omitted).

**I.**

¶12. Gleeton cites two cases in support of his theory that the trial court should have provided him with funds for a polygraph exam, *Daubert v. Merrell Dow Pharmaceuticals*, Inc., 509 U.S. 579 (1993), and *United States. v. Crumby*, 895 F.Supp. 1354 (D.Ariz. 1995). In *Daubert*, the United States Supreme Court held that the Federal Rules of Evidence superseded the *Frye* test, which required that scientific evidence be "generally accepted" in the scientific community to be admissible. *Daubert*, 509 U.S. at 585-87 (*citing Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923)). In *Crumby*, the United States District Court of Arizona found "that polygraph evidence is sufficiently reliable under *Daubert* to be admitted as scientific evidence under Fed.R.Evid. 702." *Crumby*, 895 F. Supp. at 1361. Mississippi has not adopted the *Daubert* test for determining admissibility of scientific evidence. Instead, this Court has adhered to application of the *Frye* test. *Crawford v. State*, No. 94-DP-01016-SCT, 1998 WL 105774, at *18 (Miss. March 12, 1998); *Polk v. State*, 612 So.2d 381, 390 (Miss. 1992) ("Mississippi has continued to follow the *Frye* 'general acceptance' standard even after the adoption of Rule 702 of the Mississippi Rules of Evidence."). Gleeton's reliance on *Daubert* and *Crumby* is therefore misplaced.

¶13. In general, the results of a polygraph exam or even the fact that one was taken is inadmissible in Mississippi. *Carr v. State*, 655 So.2d 824, 836 (Miss. 1995). We have only recognized an exception for the admission of evidence of an offer or refusal to take a polygraph, both of which we have found to be harmless. *Lester v. State*, 692 So.2d 755, 787 (Miss. 1997) ("evidence of an offer to take a polygraph is only admissible to support the credibility of a witness whose veracity has previously been attacked"); *Conner v. State*, 632 So.2d 1239, 1257-59 (Miss. 1993) (reference to previously impeached witness's willingness to take polygraph was not reversible error when used to rehabilitate the witness); *Stringer v. State*, 454 So.2d 468, 473-75 (Miss. 1984) (mere mention that defendant refused to take polygraph exam was not reversible error in light of the other evidence before the jury). We refuse to extend the exception to allow for funds to take a polygraph exam in anticipation of future attacks on the veracity of a potential witness. Refusal to provide funds for a polygraph exam is not reversible error.

**II.**

**THE COURT ERRED IN OVERRULING DEFENDANT'S MOTION FOR A DIRECTED VERDICT AND POST-TRIAL MOTIONS.**

**Standard of Review**

¶14. The standard of review applied to motions for directed verdict or J.N.O.V. is as follows:

Requests for a directed verdict and motions JNOV implicate the sufficiency of the evidence.

The standard of review for the legal sufficiency of the evidence is well-settled:

[W]e must, with respect to each element of the offense, consider all of the evidence--not just the evidence which supports the case for the prosecution--in the light most favorable to the verdict. The credible evidence which is consistent with the guilt must be accepted as true. The prosecution must be given the benefit of all favorable inferences that may reasonably be drawn from the evidence. Matters regarding the weight and credibility to be accorded the evidence are to be resolved by the jury. We may reverse only where, with respect to one or more of the elements of the offense charged, the evidence so considered is such that reasonable and fair-minded jurors could only find the accused not guilty.

*Wetz v. State*, 503 So.2d 803, 808 (Miss.1987) (citations omitted).

*Franklin v. State*, 676 So.2d 287, 288 (Miss. 1996).

## II.

¶15. As his second point of error, Gleeton claims that the evidence presented at trial was insufficient to support his capital murder conviction. Specifically, Gleeton contends that the only witness putting him at the scene of the crime was his co-defendant, Cathey, who had committed perjury by giving inconsistent statements under oath.

¶16. The State is required to prove every element of the offense charged beyond a reasonable doubt. *Heidel v. State*, 587 So. 2d 835, 843 (Miss. 1991). As can be seen by the statute under which Gleeton was charged, the indictment with which he was charged, and the court's instructions to the jury, the State was required to prove that Gleeton (1) killed Charles Gray, (2) without authority of law, (3) with or without any design to effect death, (4) during the commission of a robbery. Miss. Code Ann. § 97-3-19(2)(e) (1994). The State also had to prove each element of the underlying felony of robbery, that Gleeton (1) feloniously took the property of Gray, (2) in Gray's presence, (3) against Gray's will, (4) by violence against Gray or by putting Gray in fear of immediate injury. Miss. Code Ann. § 97-3-73 (1994). Cathey's testimony at his plea hearing and sentencing hearing that Gleeton was the trigger man was sufficient to support a jury finding that Gleeton killed Charles Gray while taking Gray's money from the cash register by violence against Gray.

¶17. However, the jury might also have believed, based upon Cathey's testimony at Gleeton's trial, that Cathey was the trigger man and still convicted Gleeton of capital murder. Judge Carlson properly instructed the jury on the definition of an aider and abetter. "Any person who is present at the commission of a criminal offense and aids, counsels, or encourages another in the commission of that offense is an 'aider and abettor' and is equally guilty with the principal offender." *Sayles v. State*, 552 So.2d 1383, 1389 (Miss. 1989). Even if the jury found Cathey's testimony that he (Cathey) was the trigger man credible, there was sufficient evidence for the jury to find that Gleeton consented to and encouraged the murder and robbery of Gray. Based upon Mike Curtis's testimony and Cathey's involvement in the crime and prior inconsistent statements, it was reasonable for the jury to find Cathey's testimony not wholly credible. Giving the prosecution the benefit of all favorable inferences that may reasonably be drawn from the evidence, we find that reasonable jurors could differ on the issue of Gleeton's guilt on the capital murder charge and affirm Gleeton's conviction and sentence.

## III.

## THE COURT ERRED IN FAILING TO GRANT A NEW TRIAL CONCERNING COMMENTS MADE BY A JUROR.

### Standard of Review

¶18. "The Supreme Court will reverse the lower court's denial of a motion for new trial only if, by denying, the court abused its discretion." *Morgan v. State*, 703 So.2d 832, 840 (Miss. 1997) (*quoting* *Esparaza v. State*, 595 So.2d 418, 426 (Miss. 1992)).

### III.

¶19. At the post-trial motions hearing, Gleeton requested a new trial based upon a newspaper article in which one of the jurors from his case was interviewed. Although the article was supposed to have been made part of the record as an attachment to Gleeton's motion for a new trial, no copy of the article appears in the record before us. According to statements made by defense counsel and Judge Carlson at the hearing, Juror Kathy Poole was quoted in the article as stating that Gleeton's failure to testify was "a major factor" in the jury's decision, and the jurors interpreted his silence as a lack of remorse. Defense counsel argued that Juror Poole's statement showed that the jury failed to follow the court's instructions on the defendant's right against self incrimination and the presumption of innocence. Gleeton's attorney also informed the court that Juror Poole was quoted as saying that the jury knew Gleeton was guilty when it went in for deliberations before even looking at the evidence. The defense argued that this statement meant that the verdict wasn't based upon the evidence. However, Judge Carlson found that reading the article as a whole, considering the jury instructions, and based upon Miss. R. Evid. 606(b) and Mississippi case law, there was nothing improper about the jury deliberations.

¶20. Rule 606(b) of the Mississippi Rules of Evidence governs inquiries into the validity of a verdict:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.

Miss. R. Evid. 606(b). We have previously held that Rule 606(b) precludes questioning jurors as to their diligence in following the trial court's instructions. *Folk v. State*, 576 So.2d 1243, 1250 (Miss. 1991); *see also* *Gladney v. Clarksdale Beverage Co.*, 625 So.2d 407, 418-19 (Miss. 1993). The purpose of this rule is to allow jurors to "act freely and forthrightly" in deliberations without fear of being interrogated about their actions. *Folk*, 576 So.2d at 1250. The presumption is that jurors follow the court's instructions, "are fair-minded and conscientious and will do the duty the constitution devolves upon them." *Id*.

¶21. Judge Carlson properly instructed the jury not to consider the fact that Gleeton did not testify as evidence against him and not to draw any unfavorable inferences from his decision not to testify. The court also instructed the jury on its duty to carefully weigh the evidence in reaching a verdict and on the presumption of innocence. Gleeton's contention that the jury failed to follow these instructions does not fall under the exceptions for investigating "extraneous prejudicial information" or "outside influence" on the jury under Rule 606(b). Based upon this Court's previous interpretation of Rule 606(b), Judge Carlson was correct in finding that no inquiry into the jury's alleged refusal to follow the court's instructions was required in this case. Denial of Gleeton's motion for a new trial was not an abuse of discretion under these circumstances.

## IV.

## THE COURT ERRED IN CALLING THE CO-DEFENDANT, ANTHONY CATHEY, AS THE COURT'S WITNESS, DURING THE STATE'S CASE IN CHIEF. THE COURT ERRED IN ALLOWING INTO EVIDENCE THE PRIOR TESTIMONY OF THE CO-DEFENDANT, ANTHONY CATHEY.

### Standard of Review

¶22. In *Peterson v. State*, 671 So.2d 647 (Miss. 1996), this Court pronounced the standard of review for the admissibility of evidence as follows:

> Under the Supreme Court's standard of review, the admissibility of evidence rests within the discretion of the trial court. However, this Court must also determine whether the trial court employed the proper legal standards in its fact findings governing evidence admissibility. If in fact the trial court has incorrectly perceived the applicable legal standard in its fact findings, the Court applies a substantially broader standard of review. However, a denial of a substantial right of the defendant must have been affected by the court's evidentiary ruling. Furthermore, the trial court's discretion must be exercised within the scope of the Mississippi Rules of Evidence and reversal will be appropriate only when an abuse of discretion resulting in prejudice to the accused occurs.

*Peterson*, 671 So.2d at 655-56 (internal citations omitted).

## IV.

### A. Court Calling Cathey as a Witness

¶23. The State filed a motion for the court to call Gleeton's co-defendant, Anthony Cathey, as the court's witness on August 15, 1996. Judge Carlson decided to call Cathey as the court's witness to allow both sides to cross-examine him due to Cathey's prior inconsistent statements. Rule 614 of the Mississippi Rules of Evidence gives the trial court authority to call witnesses on its own motion or upon motion by a party. Miss. R. Evid. 614(a). A party wishing to object to the court calling a witness may object at the time the witness is called "or at the next available opportunity when the jury is not present." Miss. R. Evid. 614(c).

¶24. This Court will reverse a case if the trial judge abuses the authority to call or question a witness by abandoning his impartial position as a judge and assuming an adversarial role. *West v. State*, 519

So.2d 418, 422-24 (Miss. 1988). "We have made clear that we will not hesitate to reverse where the trial judge displays partiality, becomes an advocate, or, in any significant way, conveys to the jury the impression that he has sided with the prosecution." *Layne v. State*, 542 So.2d 237, 242 (Miss. 1989). In the present case, Judge Carlson made every effort to maintain his impartiality. He instructed the jury at great length both from the bench and in the written jury instructions to ensure that they understood that his calling Cathey did not indicate any opinion regarding the merits of the case or any favor to either side. He also carefully instructed the jury on its duty to weigh evidence and evaluate witness credibility. Judge Carlson did not personally question Cathey, but merely called him as the court's witness to allow both sides to cross-examine Cathey since his pre-trial statements and his testimony at Gleeton's trial were contradictory and central to the case. We find that Judge Carlson acted within his discretion when he called Cathey as a witness.

## B. Admission of Cathey's Pre-trial Testimony

¶25. Over Gleeton's objections, Judge Carlson allowed the prosecution to enter into evidence Gleeton's plea hearing transcript and sentencing hearing transcript. At trial and on appeal to this Court, Gleeton has argued that allowing the transcripts to be admitted into evidence violated his right to confront and cross-examine witnesses against him. Gleeton cites *Seales v. State*, 495 So.2d 475, 479 (Miss. 1986), to support his position that the confrontation clause works to restrict the range of admissible hearsay. However, Cathey's prior statements are not hearsay:

> **(d) Statements Which Are Not Hearsay.** A statement is not hearsay if:
>
> (1) *Prior Statement by Witness*. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with his testimony, and was given under oath subject to the penalty of perjury at a trial, hearing or other proceeding, or in a deposition. . .

Miss. R. Evid. 801(d)(1)(A). Cathey's testimony at his plea hearing and sentencing hearing was given under oath, subject to penalty of perjury, and subject to cross-examination both at the hearings and at Gleeton's trial, where Cathey was called as a witness and gave contradictory testimony. The statements do not fall under the definition of hearsay, and Gleeton had ample opportunity to cross-examine Cathey. We find no error in the trial court's admission of the transcripts into evidence.

## CONCLUSION

¶26. Gleeton has failed to make any meritorious arguments on appeal. We therefore overrule all of his assignments of error and affirm his conviction and sentence in this case.

¶27. **CONVICTION OF CAPITAL MURDER AND CONSPIRACY TO COMMIT CAPITAL MURDER AFFIRMED. LIFE SENTENCE WITHOUT POSSIBILITY OF PAROLE TO RUN CONCURRENTLY WITH TWENTY YEAR SENTENCE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AFFIRMED.**

**PRATHER, C.J., PITTMAN, P.J., BANKS, McRAE, ROBERTS, SMITH, MILLS AND WALLER, JJ., CONCUR.**