# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2001-KA-01712-SCT

*TONY DAREL HAWTHORNE*

*v.*

*STATE OF MISSISSIPPI*


| | |
|---|---|
| DATE OF JUDGMENT: | 05/21/1999 |
| TRIAL JUDGE: | HON. ROBERT H. WALKER |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | ROBERT H. KOON |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY:    JEFFREY A. KLINGFUSS |
| DISTRICT ATTORNEY: | CONO A. CARANNA, II |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 01/16/2003 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### BEFORE SMITH, P.J., EASLEY AND GRAVES, JJ.

### EASLEY, JUSTICE, FOR THE COURT:

### PROCEDURAL HISTORY

¶1.     Tony Darel Hawthorne (Hawthorne) was indicted in the Circuit Court of Harrison County, Mississippi, for the murder of Aaron J. Seldon (Seldon).  After a jury trial the jury returned a guilty verdict, and the trial court sentenced Hawthorne to life imprisonment in the custody of the Mississippi Department of Corrections.  Hawthorne's motion for judgment notwithstanding the verdict or alternatively motion for new trial (J.N.O.V.) was denied by the trial court.  Hawthorne was appointed new counsel to handle his appeal to this Court.

## FACTS

¶2.     The brother of Yolanda Mullin (Mullin) hosted a barbecue at their mother's home the evening of September 7, 1998, that lasted until the early hours of September 8, 1998.  Among the people at the barbecue were Kelvin Barrett (Barrett), Seldon and Hawthorne.  Seldon and Hawthorne were cousins.

¶3.     During the early morning hours of September 8, 1998, Savona Autman (Autman) first saw Hawthorne standing on the porch of Rhonda Williams's (Williams) apartment with Johnny and Lashail Stewart (Stewart).  According to Autman, Hawthorne agreed to take her to get a sack of "powder", i.e. cocaine.  Autman, Stewart and Hawthorne left in Williams's car with Hawthorne driving.

¶4.     Stewart recalled that Hawthorne told them that his cousin had taken something out of his pocket.  Hawthorne did not say he was going to kill Seldon, but he was mad  that his cousin had taken his money.  Hawthorne claimed that Seldon had taken $30-$50 out of his pocket a few days before earlier while they both were at Williams's apartment.  Hawthorne, Williams and Seldon had been drinking and having "fun" when Hawthorne had gotten tired and fallen asleep.  Williams told Hawthorne that Seldon took the money while he was asleep.

¶5.     Some time before 2:00 a.m., Mullins and Chuck Potts (Potts) left the barbecue and went to Potts's house.  Barrett and Seldon had already left the barbecue and gone to Taco Bell.  Barrett was driving Seldon's truck.  Barrett and Seldon parked in front of Potts's house to eat.  Mullins and Potts saw Barrett and Seldon drive up in front of Potts's house.  Barrett was driving.

¶6.     As Autman, Stewart and Hawthorne were riding down Meadowlark Drive, Autman spotted Seldon.  She informed Hawthorne that she saw Seldon.  Hawthorne turned the car around, and he parked the car right next to Seldon's truck.  Stewart saw that Hawthorne had a gun when he got out of the car.  Stewart and Autman tried to get Hawthorne to get back in the car.

2

¶7. Barrett testified that Seldon rolled his window down. Hawthorne jumped out of the car yelling at Seldon. Mullins and Potts testified that when Barrett started the truck, Hawthorne pointed his gun at Barrett. According to Barrett, Hawthorne told him to turn off the truck or he would blow his brains out. Barrett complied.

¶8. Barrett stated that the argument between Seldon and Hawthorne was basically over money. Seldon did not seem to take Hawthorne very seriously. When Hawthorne pointed the gun at Seldon, Seldon started pulling money out of his pocket. According to Barrett, Hawthorne said, "You don't believe I'll shoot you." Seldon replied, "No, if you love me so much, no, you won't shoot me." Hawthorne was within three or four inches of Seldon when he fired the gun.

¶9. Hawthorne began shaking Seldon saying, "Cuz, cuz, wake up. Wake up." Barrett did not see Seldon try to grab Hawthorne's gun. Stewart did not look up until she heard the gun go off, and she saw Hawthorne shaking Seldon saying, "Cuz, wake up." Autman did not see Seldon grab Hawthorne's gun.

¶10. When Autman heard the shot, she ran to the house across the street and told them to call the police. Stewart jumped out of the car. She saw Hawthorne get into the truck with Seldon. Mullins and Potts went inside to call the police. Barrett exited the truck and ran. Barrett heard Hawthorne start the truck and leave with Seldon. Stewart and Autman returned to Williams's car. They attempted to follow Seldon's truck, but they lost sight of the truck.

¶11. Hawthorne testified in his own defense. Hawthorne claimed that Seldon told him, "If [y]ou want your money? Take it. Take it." Hawthorne thought "take it" meant he would have to physically take the money from Seldon. Hawthorne claimed he did not intend to shoot Seldon. Hawthorne alleged that he had armed himself merely for his protection. Hawthorne claimed that the gun fired because Seldon tried to grab it.

3

¶12. When the Gulfport police arrived on the scene at 0209 hours, they found Seldon's truck in a ditch with the engine compartment on fire. The police discovered Seldon covered with blood. The police put out the flames, and they pulled him from the vehicle. He was not responsive.

¶13. Hawthorne claimed he was attempting to take Seldon to the hospital when he drove away with Seldon in the truck. At Edgewood Manor, Hawthorne hit the curb causing the truck to wreck. Hawthorne contends that he ran to Edgewood Manor to get someone to call an ambulance, but no one would open their door. Hawthorne asserted that he never saw flames or smoke coming from the truck.

¶14. Hawthorne went to the house of his cousin, Deborah Robinson (Robinson), where he changed his clothes. When Hawthorne saw on television that Seldon had died, he left Robinson's house and went to the police station to talk with the police.

¶15. Pathologist Dr. Paul McGarry (Dr. McGarry) testified that Seldon suffered a gunshot wound that entered the right jaw area along the jaw line. The bullet went through the back and center of Seldon's spine, damaging his spinal cord, opening a jugular vein and totally opening a major artery to the brain before exiting through the upper back causing major blood loss. Dr. McGarry determined the gunshot to be Seldon's cause of death.

¶16. Following the testimony offered by the State, Hawthorne moved for a directed verdict arguing that the State had failed to make a prima facie case of the elements of deliberate design murder. The trial court denied Hawthorne's motion for J.N.O.V. or a new trial. Hawthorne now appeals his conviction to this Court.

¶17. Hawthorne raises the following issues on appeal:

    **I.    Whether the trial court erred in granting jury instruction S-3-A.**

**II.**      **Whether offering jury instruction D-12-A constituted ineffective assistance of counsel.**

**III.**      **Whether the evidence offered as to deliberate design was legally sufficient to support the jury's verdict.**

## DISCUSSION

### I. Jury Instruction S-3-A

¶18.      On appeal, Hawthorne argues that jury instruction S-3-A as given by the trial court amounted to reversible error. Jury instruction S-3-A reads as follows:

> Deliberate design means intent to kill, without authority of law and not being legally justifiable, legally excusable or under circumstances that would reduce the act to a lesser crime.

¶19.      Hawthorne contends that "by omitting any language regarding the time for forming deliberate design... was confusing and misleading to the jury." The record does not reflect that Hawthorne ever raised this objection to the deliberate design instruction at trial. However, the following exchange regarding the jury instruction is reflected in the record:

| | |
|---|---|
| The Court: | S3, where do you get that? |
| Mr. Simpson [State]: | Judge, out of a case that – we've submitted this almost in every murder case, maybe in every murder case. I will need to try to find the case that it's out of. It's a quote out of a case. |
| The Court: | Well, I think both sentences leave a big confusion as to what makes a homicide a murder. Simple design to kill, as it's addressed in the first sentence, doesn't necessarily work because it could exist in self-defense or manslaughter. The second sentence – |
| Mr. Simpson: | Those are affirmative defenses, Judge. |
| The Court: | The second sentence, "deliberate design," is really what makes murder. I think that we ought to delete the first sentence and just do "deliberate design means," et cetera. |
| Mr. Simpson: | That's fine, Your Honor. We'll amend it and submit it. |
| The Court: | Mr. Crosby? |
| Mr. Crosby [Defense]: | If we were trying this as a – say that he had lawful authority to shoot, or if we were saying it was legally |

5

|  |  |
|---|---|
|  | justifiable to shoot, of if it was legally excusable for a lesser crime, then that would be appropriate. But we have not articulated that and submitted that defense. Now, this might be appropriate if my client decides he wants manslaughter culpable negligence instruction because then that would be a distinguishing – |
| The Court: | Well, I think under – and I don't know what the State's position is on manslaughter, although they've submitted one, but I think that, based upon the case law, either side can request it. I don't think it's at the opinion of the defendant. It's ultimately up to the [c]ourt. |
| Mr. Crosby: | Oh, yeah. But what I was saying is I don't think that would be appropriate unless we were asking for one. And actually, even in a manslaughter case, you can have the deliberate design to shoot and it still can be manslaughter, so even if we do request, either side requests a manslaughter instruction, this S3 is still not appropriate because it does not fit this case. If they believe he intended to shoot, then – |
| The Court: | Well, but S1A is going to be with the deliberate design to kill, not shoot to kill. So that will take care of that. Prepare an S3A, Mr. Simpson. |
| Mr. Simpson: | Yes, sir. |
| The Court: | And just put that second sentence in there. |
| Mr. Simpson: | Yes, sir. |
| The Court: | Are you withdrawing it or do you want me to refuse it? Either one. |
| Mr. Simpson: | Excuse me? |
| The Court: | Are you withdrawing S3 or do you want me to refuse it? |
| Mr. Simpson: | I withdraw it and submit an S3A. |
| Mr. Crosby: | Although, Judge, unless we ask for a lesser crime, then this instruction is confusing and misleading. |
| The Court: | I don't think so. I think this is assisting the jury on what deliberate design means, and that's an element of the crime of murder with the deliberate design to kill. |
| Mr. Crosby: | All right. |
| The Court: | So I don't think that hurts, unless you know of a case that says otherwise. |

¶20.    In *Jones v. State*, 776 So.2d 643, 653 (Miss. 2000), Jones asserted that the trial court

committed reversible error in granting the State's jury instruction. *Id*. However, Jones had failed to object

to the jury instruction offered by the State at trial. ***Id***. This Court determined that Jones had waived any objection by not objecting to the jury instruction at trial. This Court stated:

> This Court has held on numerous occasions that an offered party's failure to object to jury instructions at trial procedurally bars the issue on appeal. ***Walker v. State***, 729 So.2d 197, 202 (Miss. 1998); *See also* ***Green v. State***, 631 So.2d 167, 173 (Miss. 1994) ("Green failed to object to the manslaughter instruction given at trial; therefore, it is not necessary for us to review this assignment.").

776 So.2d at 653. Accordingly, since Hawthorne did not make this objection at trial, this issue is now procedurally barred. Even if this issue is not procedurally barred, this Court has previously addressed the exact language given in jury instruction S-3-A. This Court in ***Tran v. State***, 681 So.2d 514, 516 (Miss. 1996), considered the language of a similar deliberate design instruction. In ***Tran***, the first paragraph of jury instruction S-1 provided that:

> Deliberate design means intent to kill without authority of law and not being legally justifiable, legally excusable or under circumstances that would reduce the act to a lesser crime.

***Id***.

¶21. Tran's objection to this definition of deliberate design was determined by the Court to be without merit. ***Id***. at 517. This Court determined:

> '[I]t has long been the case law of this state that malice aforethought, premeditated design, and deliberate design all mean the same thing.' ***Windham v. State***, 602 So.2d 798, 801 (Miss. 1992) (quoting ***Johnson v. State***, 475 So.2d 1136, 1139 (Miss. 1985)) (citing ***Dye v. State***, 127 Miss. 492, 90 So.180 (1921); ***Hawthorne v. State***, 58 Miss. 778 (1881); ***McDaniel v. State***, 16 Miss. (8 S. & M.) 401 (Miss. 1847)). 'Definitionally [sic], we regard 'malice aforethought' and 'deliberate design' as synonymous.' ***Blanks v. State***, 542 So.2d 222, 227 (Miss. 1989) (citing ***Fairman v. State***, 513 So.2d 910, 913 (Miss. 1987)); ***Johnson v. State***, 475 So.2d 1136, 1139 (Miss. 1985); ***Lancaster v. State***, 472 So.2d 363, 367 (Miss. 1985)). Thus, Tran's arguments against the first paragraph of Instruction S-1 are meritless.

7

¶22. This holding in **Tran** was subsequently relied upon by the Court in **Jones v. State**, 710 So.2d 870 (Miss. 1998). The Court in **Jones** stated:

> In **Tran v. State**, this Court found appropriate an instruction that read, 'Deliberate design means intent to kill, without authority of law and not being legally justifiable, legally excusable or under circumstances that would reduce the act to a lesser crime.' **Tran**, 681 So.2d at 516. The Court stated that '[t]here is no flaw in the instruction given as it does not state that deliberate design can be formed at the very moment of the fatal act, ...' **Id**. This Court has also acknowledged that 'deliberate design' to take the life of another connotes intent to kill. **Peterson v. State**, 242 So.2d 420, 427 (Miss. 1970).

**Jones**, 710 So.2d at 877-78.

¶23. We find that this issue is both procedurally barred from being raised on appeal, as well as, without merit.

## II. Ineffective Assistance of Counsel

¶24. The defense submitted jury instruction D-12-A which was given without objection. D-12-A instructed the jury that if they found Hawthorne guilty of the elements of manslaughter they were to convict him as charged. D-12-A provides as follows:

> Manslaughter is a lesser included charge to [m]urder.
>
> If you find from the evidence in this case beyond a reasonable doubt that:
>
> 1. Tony Darel Hawthorne, on or about September 8, 1998, in Harrison County First Judicial District
> 2. Killed Aaron J. Seldon
> 3. By discharging a pistol, and
> 4. Tony Darel Hawthorne was negligent and the negligence was so gross as to be tantamount to a wanton disregard of, or utter indifference to, the safety of human life, and
> 5. Such negligence, if any, directly caused the death of Aaron J. Seldon, and further discharge was not accidental,
>
> Then you shall find the defendant guilty as charged.

> If the [p]rosecution has failed to prove any one or more of the above listed elements beyond a reasonable doubt, then you shall find Tony Darel Hawthorne not guilty.

¶25. Hawthorne's new counsel argues that submission of this jury instruction constitutes ineffective assistance of counsel. Hawthorne contends that since he was charged with murder, the stated language in jury instruction D-12-A, "[t]hen you shall find the defendant guilty as charged," effectively prevented the jury from considering the lesser included offense of manslaughter. We find that this issue is wholly without merit.

¶26. Hawthorne argues that this Court should reverse this case based on one sentence contained in the manslaughter instruction. However, that is not the standard of review that is followed by this Court. In *Woodham v. State*, 800 So.2d 1148, 1156 (Miss. 2001), this Court stated the correct standard of review as follows:

> This Court has repeatedly stated that "when considering a challenge to a jury instruction on appeal, we do not review jury instructions in isolation; rather, we read them as a whole to determine if the jury was properly instructed." *Burton ex rel. Bradford v. Barnett*, 615 So.2d 580, 583 (Miss. 1993). "[I]n determining whether error lies in the granting or refusal of various instructions, the instructions actually given must be read as a whole. When so read, if the instructions fairly announce the law of the case and create no injustice, no reversible error will be found." *Coleman v. State*, 697 So.2d 777, 782 (Miss. 1997) (quoting *Collins v. State*, 691 So.2d 918 (Miss. 1997)). In other words, if all instructions taken as a whole fairly, but not necessarily perfectly, announce the applicable rules of law, no error results.

¶27. Reviewing D-12-A in conjunction with the other instructions given by the trial court, we find that granting D-12-A did not constitute reversible error. Furthermore, the defense's decision to submit instruction D-12-A does not constitute ineffective assistance of counsel.

¶28. This Court has repeatedly examined ineffective trial counsel claims pursuant to *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 675 (1984). In *Ferguson v. State*, 507 So.2d 94 (Miss. 1987), this Court stated:

> Claims of ineffective assistance of counsel are governed by guidelines of ***Strickland v Washington***, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 675 (1984). "First," said the Supreme Court, "the defendant must show that counsel's performance was deficient. ...Second, the defendant must show that the deficient performance prejudiced the defense." Although it need not be outcome determinative in the strict sense, 466 U.S. at 687, 104 S.Ct. at 2068, 80 L.Ed.2d at 697-98, it must be grave enough to "undermine confidence" in the reliability of the whole proceeding. 466 U.S. at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698. In practice this second element of the ***Strickland*** test has proved an insuperable obstacle to many criminal appellants. Even a demonstrably deficient performance by a lawyer can be held insufficiently prejudicial where the evidence of the defendant's guilt is strong.

507 So.2d at 95.

¶29. It is the duty of the Court to determine, based on the totality of the circumstances, whether the counsel's efforts were both deficient and prejudicial, thereby necessitating a reversal. *See **Henley v. State***, 729 So.2d 232, 241 (Miss. 1998); ***Waldrop v. State***, 506 So.2d 273, 275 (Miss. 1987). We find that Hawthorne has not demonstrated that the representation he was provided fell below an objective standard of reasonableness. Hawthorne has not demonstrated how the instruction operated to result in actual prejudice to his defense. As given, D-12-A clearly instructs the jury that the manslaughter instruction is given as a lesser included charge to murder. This issue is without merit.

### III. Legal Sufficiency and Overwhelming Weight of the Evidence

¶30. Hawthorne asserts that the jury verdict is not legally sufficient nor supported by the weight of the evidence to sustain his murder conviction due to inconsistencies in witnesses' testimony offered at trial.

¶31. On the issue of legal sufficiency, reversal can only occur when evidence of one or more of the elements of the charged offense is such that 'reasonable and fair minded jurors could only find the accused not guilty." ***Wetz v. State***, 503 So.2d 803, 808 (Miss. 1987). The standard of review for a denial of a directed verdict, peremptory instruction and a J.N.O.V. are identical. ***Coleman v. State***, 697 So.2d 777, 787 (Miss. 1997). In ***McClain v. State***, 625 So.2d 774, 778 (Miss. 1993), this Court held that a motion

for J.N.O.V., motion for directed verdict and a request for peremptory instruction challenge the legal sufficiency of the evidence. "Since each requires consideration of the evidence before the court when made, this Court properly reviews the ruling on the last occasion the challenge was made in the trial court. This occurred when the circuit court overruled [the] motion for JNOV." *Id.* at 778 (citing *Wetz v. State*, 503 So.2d 803, 807-08 (Miss. 1987)).

¶32.    In regard to the weight of the evidence, it is well established that matters regarding the weight of the evidence are to be resolved by the jury. *Neal v. State*, 451 So.2d 743, 758 (Miss. 1984). "The court is bound by the jury findings upon an issue presented by the instruction requested by the [defendant]." *Kinney v. State*, 336 So.2d 493, 496 (Miss. 1976). A motion for new trial challenges the weight of the evidence. *Sheffield v. State*, 749 So.2d 123, 127 (Miss. 1999). A reversal is warranted only if the trial court abused its discretion in denying a motion for new trial. *Id*. (citing *Gleeton v. State*, 716 So.2d 1083 (Miss. 1998)). This Court held in *McFee v. State*, 511 So.2d 130, 133 (Miss. 1987), that it has limited authority to interfere with a jury verdict. The Court looks at all the evidence in the light most consistent with the jury verdict. *Id*. The prosecution is given "the benefit of all favorable inferences that may reasonably be drawn from the evidence." *Id*. The Court in *McFee* stated that:

> [I]f there is in the record substantial evidence of such quality and weight that, having in mind the beyond a reasonable doubt burden of proof standard, reasonable and fair-minded jurors in the exercise of impartial judgement might have reached different conclusions, the verdict of guilty is thus placed beyond our authority to disturb.

*Id*. at 133-34. *See also May v. State*, 460 So.2d 778, 781 (Miss.1984).

¶33.    A new trial will not be granted unless the verdict is so contrary to the overwhelming weight of the evidence that an unconscionable injustice would occur by allowing the verdict to stand. *Groseclose v. State*, 440 So.2d 297, 300 (Miss. 1983). *See also Danner v. State*, 748 So.2d 844, 846 (Miss. Ct.

11

App. 1999). However, if a jury verdict convicting a defendant is against the overwhelming weight of the evidence, then the remedy is to grant a new trial. ***Collier v. State***, 711 So.2d 458, 461 (Miss. 1998).

¶34. As to the credibility of witnesses, this Court in ***Gathright v. State***, 380 So.2d 1276 (Miss. 1980), has held that "in a criminal prosecution the jury may accept the testimony of some witnesses and reject that of others, and that they may accept in part and reject in part the evidence on behalf of the state or on behalf of the accused. In other words, the credibility of witnesses is not for the reviewing court." ***Gathright***, 380 So.2d at 1278 (citing ***Davis v. State,*** 320 So.2d 789 (Miss.1975)).

¶35. In the case sub judice, the evidence met the legal sufficiency test and the weight of the evidence test for a denial of the motion for J.N.O.V. and motion for new trial. Sufficient testimony was offered to support the murder conviction. The testimony established that Hawthorne went looking for Seldon. Hawthorne was upset that Seldon had stolen money from him.

¶36. Hawthorne borrowed Williams's car and then left with Autman and Stewart. When Autman spotted Seldon, Hawthorne turned the car around to pull in beside Seldon's truck. Seldon was sitting in the passenger seat of his truck. Hawthorne got out the car and stood beside Seldon's truck. Seldon remained seated in the truck.

¶37. Barrett was in the driver's seat of Seldon's truck. Hawthorne ordered Barrett to turn off the truck. An argument ensued between Hawthorne and Seldon. Hawthorne pulled his gun on Seldon. Hawthorne shot Seldon while he was still sitting in the truck.

¶38. Hawthorne claimed he never intended to shoot Seldon, and he brought the gun only for his own protection. Hawthorne alleged that Seldon tried to grab his gun which caused it to fire. No other witness confirmed Hawthorne's account of how the gun fired. However, there is no contradiction that Hawthorne did bring and fire the gun.

12

¶39. Dr. McGarry testified that Seldon's cause of death was the gunshot wound to his jaw which caused damage to his spinal cord and totally opened a major artery to his brain.

¶40. This Court has held that "deliberate design may be inferred from the use of a deadly weapon." *Carter v. State,* 722 So.2d 1258, 1263 (Miss. 1998). *See also* **Mitchell v. State,** 803 So.2d 479, 484 (Miss. Ct. App. 2001).

¶41. We find that there is sufficient evidence in the record to support the jury's verdict finding Hawthorne guilty of murder. Furthermore, it is clear that a reasonable, fairminded juror could find beyond a reasonable doubt that Hawthorne was guilty of Seldon's murder. Therefore, we find that there was ample evidence presented for the jury to find deliberate design. This issue is without merit.

## CONCLUSION

¶42. For the foregoing reasons, the judgment of the Harrison County Circuit Court is affirmed.

¶43. **CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED.**

**PITTMAN, C.J., McRAE AND SMITH, P.JJ., WALLER, COBB, DIAZ, CARLSON AND GRAVES, JJ., CONCUR.**