IRVING, J.,
for the Court.
¶ 1. Lonnie Massey was convicted by a jury in the Circuit Court of Leflore County of receiving stolen property and was sentenced to five years in the custody of the Mississippi Department of Corrections. Feeling aggrieved, Davis has appealed and asserts that (1) the trial court erred in overruling his objection to improper redirect examination by the State, (2) the trial court erred in overruling his motion for a *1021 mistrial following the state’s improper cross-examination of him, and (3) the trial court erred in refusing to grant a peremptory instruction, motion for a new trial, or JNOV.
¶ 2. Ascertaining no error, we affirm.
FACTS
¶3. On the morning of February 26, 2001, it was discovered that the Swiftown Post Office had been burglarized. Amongst those things taken were approximately $2,900 in stamps, a money order machine, thirty-three blank money orders, and forty dollars in cash.
¶4. Lonnie Massey was subsequently arrested and indicted for receiving property stolen in the post office burglary. He was found guilty, sentenced to five years in the custody of the Mississippi Department of Corrections and ordered to pay a $1,000 fine, $300 in attorney’s fees, and $250 in court costs.
¶ 5. Massey filed the usual post-trial motion which was denied, leading to this appeal.
ANALYSIS AND DISCUSSION OF THE ISSUES

1. Objection to Redirect Examination

¶ 6. Massey first argues that the trial court erred by overruling his objection to certain redirect examination conducted by the State. Specifically, Massey takes issue with the State’s redirect of Bradley Cram-er, a United States Postal Inspector, as being outside the scope of his own cross-examination of the same witness. The State counters that the trial court did not abuse its discretion in concluding that the State’s redirect of Cramer was pertaining to the same subject matter as that explored on cross-examination.
¶ 7. The line of questioning explored by Massey of Cramer during cross-examination was as follows:
Q: And there’s no — well, do you have any direct evidence of his having knowledge that these (money orders) were stolen?
A: I personally do not have any evidence. Just testimony or — not testimonies, but interview of other people.
Q: Do you have any information that Mr. Massey personally attempted to cash any money orders in Tennessee or Arkansas?
A: In which states, I’m sorry?
Q: Tennessee or Arkansas. That he personally attempted to cash money orders?
A: Not in those two states. No.
Q: You charged three other people in Mayfield, Kentucky who cashed the money orders?
A: Yes.
Q: And only months later did you decide to charge Mr. Massey with possession of stolen money orders?
A: That’s not true.
¶ 8. On redirect, the State conducted the following examination of Kramer:
The State: During your investigation of the money orders that turned up at the Indianola Post Office, did you discover that money order to have been one that was stolen in Swiftown?
Counsel for Massey: Improper re-direct. Objection, Your Honor.
The Court: From what I heard of the question, sustained.
The State: Your Honor, he even asked about the money orders that had popped up in different places to which the witness testified to Kentucky, Missouri, and—
*1022 The Court: Approach.
(The following bench conference was held:)
The Court: What are you intending to ask him about the money order that popped up at the Indianola Post Office?
The State: That it was stolen from the Swiftown Post Office. He brought it out in cross. I am on re-direct. You asked about money orders popping up in Kentucky.
Attorney for Massey: I didn’t ask about money orders in Indianola.
The Court: I am going to allow it.
The State: Thank you, Your Honor.
(The bench conference concluded.)
The State: Did you find stolen money orders that had been cashed in Indi-anola, Mississippi?
Kramer: Yes, I did.
The State: And who was that money order cashed by?
Kramer: A Xavier Dean.
The State: And the money order that Xavier Dean cashed at the Indianola Post Office was one of the stolen ones?
Kramer: Yes, it was.
The State: From the Swiftown Post Office.
Kramer: Yes, it was.
The State: Thank you.
According to Massey, the information elicited by the State during the re-direct examination of Cramer was damaging to Massey and deprived him of his Sixth Amendment right to fully confront a witness called against him and thereby deprived him of a fair trial.
¶ 9. We find no merit in Massey’s contentions. This Court wrote in Greer v. State, 755 So.2d 511, 516 (¶ 14) (Miss.Ct.App.1999), that trial courts have broad discretion in allowing or disallowing redirect examination of witnesses and when the defense attorney inquires into a subject on cross-examination of the State’s witness, the prosecutor on redirect is unquestionably entitled to elaborate on the matter. Manning v. State, 835 So.2d 94, 99-100 (¶ 15) (Miss.Ct.App.2002). “Also, we will not disturb a trial court’s ruling on matters pertaining to redirect examination unless there has been a clear abuse of discretion.” Conley v. State, 790 So.2d 773, 786 (¶ 36) (Miss.2001).
¶ 10. On his cross-examination of Cramer, Massey’s counsel inquired about various states where money orders, which had been stolen from the Swiftown Post Office, had been attempted to be cashed. This questioning brought into issue whether a casual connection existed between individuals who had attempted to cash these stolen money orders and Massey’s prior possession of money orders he admitted to maintaining. Since Manning’s counsel opened this inquiry, we cannot say that the State’s questioning on this issue was improper redirect under these circumstances, as the prosecution inquired as to where in Mississippi someone had attempted to cash stolen money orders. Accordingly, we do not find that the trial judge abused her discretion. This issue is without merit.

2. Motion for Mistrial

¶ 11. Massey next contends that the trial court erred when it overruled his motion for mistrial; He explains that the State improperly cross-examined him as a witness when it used prejudicial hearsay in an effort to impeach him. During the cross-examination of Massey by the State, the following exchange occurred:
The State: You know Joe Kemp?
Massey: Yes, ma'am.
*1023 The State: How is Joe Kemp related to this Keith Kemp.
Massey: That’s his brother.
The State: His brother. Did you know that Joe Kemp got arrested with two money orders up in Tennessee that he told the police that you gave to him.
Counsel for Massey: Objection, Your Honor.
The Court: Sustained. Sustained. And I’m going to ask the jury to disregard that statement as if it was never said.
Counsel for Massey: Your Honor, may we approach briefly?
(The following bench conference was held:)
Counsel for Massey: I believe the Court’s instruction to the jury was warranted, but I’m afraid this was very deliberate in nature. In my opinion, she is trying to elicit hearsay testimony and it’s most incriminating in nature and I am going to move for a mistrial, Your Honor.
The Court: What says the State?
The State: Your, Honor, I don’t think a mistrial is warranted in this. I asked him if he was aware of this fact. The only thing he could say was yes or no. And the defense counsel — I was very lenient when he testified to everything Keith Kemp told him and Jessie and everybody else. I want him to testify to what was said, and I did not accuse him. I asked him was he aware of it.
The Court: I’m going to deny the mistrial at this point, but I’m going to caution you, Mrs. Chiles.
The State: Yes, ma'am.
(The bench conference concluded.)
¶ 12. According to Massey, the remark made by the State was in the guise of a question to him and contained what amounted to hearsay evidence. He further explains that the State’s remark clearly was not intended to elicit a response but rather was intended to indicate guilty knowledge and impeach and prejudice him. Despite acknowledging the trial court’s instruction to the jury to disregard the State’s question and its cautioning of the State, Massey contends that the trial court’s instruction was not sufficient to cure the damage done by the State, and therefore, its failure to grant a mistrial after his objection was error.
¶ 13. The State counters that the trial court’s admonishment to the jury was sufficient to stem any prejudice flowing from the prosecutor’s unanswered question. It further asserts that the trial court was in the best position to make this determination, and consequently, its ruling should not be disturbed.
¶ 14. Our standard of review of the trial court’s decision denying a mistrial is abuse of discretion:
Case law unequivocally holds that the trial judge is in the best position for determining the prejudicial effect of an objectionable remark. The judge is provided considerable discretion to determine whether the remark is so prejudicial that a mistrial should be declared. Where serious and irreparable damage has not resulted, the judge should admonish the jury then and there to disregard the impropriety.
Coho Resources, Inc. v. McCarthy, 829 So.2d 1, 18(¶ 50) (Miss.2002) (citing Roundtree v. State, 568 So.2d 1173, 1177-78 (Miss.1990)). The rule is well established in the jurisprudence of our state that the jury is presumed to follow an admonition of the trial court to disregard objectionable evidence and that the court’s admonition is usually deemed sufficient to remove any prejudicial effect from the minds of the jurors. Walker v. State, 671 So.2d 581, 621-22 (Miss.1995).
*1024 ¶ 15. We find that any harm done, as a result of the question that was asked, was minimal. Upon Massey’s objection to the State’s questioning, the trial judge issued a corrective instruction to the jurors to disregard the prosecutor’s question. We presume that the jury followed the admonition of the trial court and further find that the improper comment was cured by the trial court’s instruction to the jury. Moreover, the State’s question did not explicitly indicate or otherwise disclose any information about whether Massey possessed guilty knowledge that the money orders had been stolen. Therefore, the trial court did not abuse its discretion in denying Massey’s motion for a mistrial, as it was in the best position to make this assessment.

3. Denial of Directed Verdict, Peremptory Instruction, and JNOV

¶ 16. Massey argues that the State’s case was insufficient to survive his motion for a directed verdict of acquittal made at the close of the State’s case and that the trial court should have granted his requested peremptory instruction. He further contends that the trial court committed error by denying his motion for new trial or for a judgment notwithstanding the verdict.
¶ 17. The standard of review for a denial of a directed verdict, peremptory instruction and a JNOV are identical. Hawthorne v. State, 835 So.2d 14, 21(¶ 31) (Miss.2003) (citing Coleman v. State, 697 So.2d 777, 787 (Miss.1997)). In McClain v. State, 625 So.2d 774, 778 (Miss.1993), our supreme court held that a motion for JNOV, motion for directed verdict, and a request for peremptory instruction challenge the legal sufficiency of the evidence. “Since each requires consideration of the evidence before the court when made, this Court properly reviews the ruling on the last occasion the challenge was made in the trial court. This occurred when the circuit court overruled [the] motion for JNOV.” Id. at 778 (citing Wetz v. State, 503 So.2d 803, 807-08 (Miss.1987)). On the issue of legal sufficiency, reversal can only occur when evidence of one or more of the elements of the charged offense is such that “reasonable and fair-minded jurors could only find the accused not guilty.” Hawthorne, 835 So.2d at 21(¶ 31) (quoting Wetz v. State, 503 So.2d at 808).
¶ 18. Massey was convicted of receiving stolen property pursuant to Mississippi Code Annotated section 97-17-70 (Rev. 2000):
(1) A person commits the crime of receiving stolen property if he intentionally possesses, receives, retains or disposes of stolen property knowing that it has been stolen or having reasonable grounds to believe it has been stolen, unless the property is possessed, received, retained or disposed of with intent to restore it to the owner.
The State had to prove all elements of this crime beyond a reasonable doubt as it related to the actions of Massey.
¶ 19. At trial, Massey stated that on Saturday, February 24, 2001, he was working at Carl Engle’s industrial shop in Swif-town. While at work that afternoon, he explained that he hurt his right thumb and left knee when he fell at work. After bandaging his thumb, he stated that he went to the house of Paul Pittman, a neighbor, to drink. He said he later saw his friend Keith Kemp who was having car trouble. After helping Kemp fix his car, Massey returned to Pittman’s house, where Kemp soon after returned. He stated that a black male named Jesse, who was riding with Kemp, inquired as to where he could cash a money order. Massey proclaimed he told Jesse that he did not know of any place that would cash the *1025 money order so late at night. Thereafter, Jesse and Kemp offered Massey five money orders for $200 each in exchange for $200 cash until the men returned to Swif-town that upcoming Sunday. After Kemp guaranteed their return with Massey’s money, Massey stated that he accepted the money orders. Massey explains that the next day, after receiving several comments from people affirming that he should go see a doctor about his thumb, he made several attempts to cash one of the money orders. Massey stated that he did not think Kemp would mind if he cashed a money order to get his money back. After several unsuccessful attempts to cash one of the money orders at stores, he said he attempted to sell one of the money orders to the sister of Lavon Ginn; however, she did not buy the money order because the date was wrong on it. That Monday, Massey stated that he set out for Tennessee to find Kemp to get his money. On his way, he affirmed that he picked up a hitchhiker just east of Memphis, drove to Jackson, Tennessee and dropped the hitchhiker off. At that time, Massey revealed that he asked the hitchhiker to get rid of the money orders for him and that the hitchhiker asked if he could keep one. Massey stated he told him that he did not care. From there, Massey explained that he found Kemp and retrieved some of his money.
¶ 20. Despite Massey’s account of what transpired on the weekend of February 24, 2001, other witnesses portrayed a different series of events that occurred that weekend. Henry McGlawn, the postmaster of the Swiftown Post Office, testified that when he arrived at work the morning of Monday, February 26, 2001, he found the office had been burglarized. He also affirmed that a stamp stock box, a money order imprinting machine, and thirty-three blank money orders were missing.
¶ 21. Timothy Washington testified that at approximately 7:30 a.m. on Sunday morning of February 25, he was sitting in front of a Terry Shaver’s house in his car. Washington explained that while he was there he saw Lonnie Massey walking down the road. According to him, Massey stopped and asked Washington for a ride to Moorhead. Washington testified that he told Massey he had something else to do but agreed to take him to the shop where Massey worked. He stated that while riding in his car, Massey told Washington that he had $6,000 worth of money orders, opened an envelope that he possessed, and showcased fifteen or twenty or more $200 money orders. He also testified that Massey offered him one of the $200 money orders in exchange for a ride to Moorhead.
¶ 22. Lavon Ginn a co-worker of Massey, testified that Massey drove up to La-voris mother’s house at about noon that same Sunday. Massey asked him if he knew where he could cash a money order. Lavon stated that he had advised Massey to wait till Monday, but that Massey replied that he needed the cash immediately so that he could pay for medical attention to his injured hand. Lavon testified that he asked Massey why did he not just go to the doctor immediately but stated that Massey was adamant about going to a doctor the next day in Tennessee. Lavon explained that he drove Massey to a Su-perValue store in Belzoni but that Massey was unsuccessful in getting the money order cashed there. Lavon testified that they then returned to Swiftown where Massey asked Lavon’s sister, Martha Ramsey, to purchase the money order. He explained that his sister refused to purchase the money order from Massey after reviewing it. Lavon then stated that he drove Massey to Moorhead, where Massey offered someone named Dean a $200 money order in exchange for $80 to $100. *1026 Lavon affirmed that the two men came to an agreement and the exchange was made. He then testified that he brought Massey back to Swiftown.
¶23. Martha Ramsey, Lavon’s sister, corroborated Ginn’s testimony concerning Massey’s offer of the money order. She testified that Massey offered to sell her a $200 money order for $150, but that she declined his offer because the date on it was not correct.
¶ 24. Matthew Ramsey testified that at approximately 10:30 p.m. on Saturday, February 24, 2001, Massey telephoned him and asked him to go over and get Timmy (Washington) to take him to Swiftown. Ramsey stated that Massey offered him $200 in cash or a money order in exchange of inducing Washington to give Massey a ride.
¶ 25. Carl Engle, Massey’s employer at the time, testified that he had gone out of town for Mardi Gras and returned on Ash Wednesday, February 28, to find his company truck missing. He explained that he discovered that Massey had left a number where he could be reached on Engle’s answering machine, that he called the number and spoke to Massey, and that he asked Massey where he was and why he had taken the truck. Engle stated that Massey explained he could not get help where he was and that he had hurt himself. He also explained that Massey told him where he could pick up the truck. After coming into contact and talking with the postmaster in Swiftown, Engle testified that he became aware of an investigation that possibly involved a truck matching a description of his truck. He stated he soon after gave the postmaster and an investigating agent the information Massey had given him regarding the location of his truck in Tennessee. Engle also affirmed that he thereafter met with a postal inspector in Tennessee before retrieving his truck.
¶ 26. Bradley Cramer, a postal inspector for the United States Postal Inspection Services testified that he had investigated the burglary of the Swiftown Post Office. He stated that several items were missing including thirty-three blank money orders.[1] He explained that his investigation of the Swiftown post office burglary lead to the arrest of an individual who had attempted to cash one of these money orders in Jackson, Tennessee. Cramer explained that he reviewed the investigative memorandum of the detainee, discovered that the detainee had described a white flat bed truck he had gotten a ride in, and found out from the postmaster that the truck belonged to a Carl Engle. According to Cramer, this series of discoveries led him to interview Massey, who he found was in possession of the truck. Cramer obtained a statement from Massey concerning his possession of alleged stolen money orders. In his statement, Massey made no mention of a friend named Keith Kemp or Massey’s efforts to help him. Cramer acknowledged that several arrests had been made of individuals who had attempted to cash stolen money orders in Tennessee and Kentucky and that these money orders had originated from the burglary of the Swiftown post office. He finally stated that each of the detainees indicated that they knew Massey.
¶ 27. We find that more than sufficient evidence existed to support Massey’s conviction of receiving stolen property. In such a criminal prosecution, it is the jury’s function, after hearing all evi *1027 dence and receiving applicable law and instructions, to accept the testimony of some witnesses and reject that of others, as well as to accept in part and reject in part the evidence on behalf of the state or on behalf of the accused. Gathright v. State, 380 So.2d 1276, 1278 (Miss.1980). In other words, the credibility of witnesses is not for the reviewing court. Id. We find that the jury accomplished its role and refuse to disturb its verdict.

I. Motion for New Trial

1128. A motion for new trial challenges the weight of the evidence. Hawthorne, 835 So.2d at 22 (¶ 32) (citing Sheffield v. State, 749 So.2d 123, 127 (Miss.1999)). A reversal is warranted only if the trial court abused its discretion in denying the motion. Id. (citing Gleeton v. State, 716 So.2d 1083 (Miss.1998)). The appellate court has limited authority to interfere with a jury’s verdict. Id. The court looks at all the evidence in the light most consistent with the jury’s verdict. Id. A new trial will not be granted unless the verdict is so contrary to the overwhelming weight of the evidence that an unconscionable injustice would occur by allowing the verdict to stand. Id. at (¶ 33) (citing Groseclose v. State, 440 So.2d 297, 300 (Miss.1983)).
¶29. Considering the evidence previously described in this opinion, we are not persuaded that the verdict is so contrary to the overwhelming weight of the evidence that allowing it to stand would sanction an unconscionable injustice. Consequently, we affirm the trial judge’s denial of Massey’s motion for a new trial.
¶ 30. THE JUDGMENT OF THE CIRCUIT COURT OF LEFLORE COUNTY OF CONVICTION OF POSSESSION OF STOLEN PROPERTY AND SENTENCE OF FIVE YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AND FINE OF $1,000 IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO LEFLORE COUNTY.
McMILLIN, C. J., KING AND SOUTHWICK, P.JJ., BRIDGES, THOMAS, LEE, MYERS, CHANDLER AND GRIFFIS, JJ., CONCUR.

. The serial numbers of the blank money orders stolen from the Swiftown post office were 837672867 through 837672899.