# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-KA-01260-COA

**SAMANTHA SIMMONS A/K/A SAMANTHA RACHELLE SIMMONS**                    APPELLANT

**v.**

**STATE OF MISSISSIPPI**                                              APPELLEE

DATE OF JUDGMENT:            10/03/2022
TRIAL JUDGE:                HON. ANTHONY ALAN MOZINGO
COURT FROM WHICH APPEALED:  LAMAR COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:     OFFICE OF STATE PUBLIC DEFENDER
                            BY:  GEORGE T. HOLMES
ATTORNEY FOR APPELLEE:      OFFICE OF THE ATTORNEY GENERAL
                            BY:  ALEXANDRA LEBRON
DISTRICT ATTORNEY:          HAL KITTRELL
NATURE OF THE CASE:         CRIMINAL - FELONY
DISPOSITION:                AFFIRMED - 01/16/2024
MOTION FOR REHEARING FILED:

**BEFORE WILSON, P.J., WESTBROOKS AND SMITH, JJ.**

**WESTBROOKS, J., FOR THE COURT:**

¶1.     On August 24, 2022, a Lamar County grand jury indicted Samantha Simmons for one count of receiving stolen property pursuant to Mississippi Code Annotated section 97-17-70 (Rev. 2014) and one count of first-degree murder pursuant to Mississippi Code Annotated section 97-3-19(1)(a) (Supp. 2017).  After a three-day jury trial, Simmons was found guilty of both counts.  She was sentenced to serve twenty years for the conviction of receiving stolen property and life imprisonment for the first-degree murder conviction in the custody of the Mississippi Department of Corrections.  The sentences were ordered to run consecutively.  The trial court denied Simmons' motion for judgment notwithstanding the

verdict or a new trial. Simmons now appeals, arguing that (1) the evidence was insufficient for both convictions, and (2) the verdicts were contrary to the weight of the evidence for both convictions. Finding no error, we affirm Simmons' convictions and sentences.

**FACTS AND PROCEDURAL HISTORY**

¶2. Thomas Burns and his wife, Pamela Burns, lived in Purvis, Mississippi. Before meeting Pamela, Thomas had a drug problem, but Pamela helped him overcome his addiction and get his life and finances in order. Thomas worked for TEI Construction as a boilermaker, and most of the jobs that he was assigned to were located in Texas. Depending on the job, he would be gone anywhere from two weeks to nine months at a time.

¶3. In November 2017, Thomas was working a job in Lubbock, Texas. He had to leave that job early so that he could go home and take care of Pamela, who was suffering from bone cancer. She passed away the following month, which greatly affected Thomas. He carried her urn everywhere he went and eventually reverted to using drugs.

¶4. In early 2018, Thomas met Samantha Simmons. They began dating, and eventually Simmons moved in with Thomas. In March 2018, Thomas' neighbors became concerned because they had not seen nor heard from him. Thomas was close to his neighbors Jasper "Jaybird" Carlisle and Johnnie "Debo" Ratcliff. Both Jaybird and Debo testified that they would often go visit Thomas at his home, or he would come and visit them at their homes. So they found it was unusual when they suddenly stopped seeing Thomas and did not hear from him for several weeks.

¶5. Jaybird testified that when Thomas was home, he would walk over to his house every

2

morning, and they would chat over coffee. On March 26, 2018, Jaybird stopped by Thomas'

house to see him, but Samantha answered the door and said that he was in Pascagoula.

Jaybird tried to revisit Thomas the following day, but then Samantha told him that Thomas

decided to relocate to Texas. Jaybird questioned Samantha about Thomas' alleged relocation

because he noticed that all five of Thomas' vehicles were still at his home. Samantha told

him that Thomas decided to rent a car to travel to Texas. Jaybird testified, "I know Thomas.

I knew him well. It just didn't set right with me because he was going to Texas and not going

to get a vehicle to go in. He was going to rent one, where he's got five sitting at his house."

¶6.    Debo also tried to check on Thomas several times; however, Samantha continuously

told him that Thomas was out of town. Eventually Debo became concerned and decided to

go to the Lamar County Sheriff's Office to try to file a missing person's report, but the office

would not allow it because he was not related to Thomas. Debo saw Samantha again one day

on the side of the road, crying, in Thomas' white Dodge Magnum. He pulled over and asked

her again if she had seen Thomas. She said that Thomas was attending school in Texas.

Johnnie testified that "when she said school, I knew right then she was lying . . . because

Thomas couldn't read or write."

¶7.    As the weeks passed, Jaybird and Debo grew more concerned. Debo testified that on

May 21, 2018, he saw a truck pulling a trailer with a lot of furniture leaving Thomas'

driveway. He decided to follow the truck until it stopped at a house. Afterward, he went

back home and called the police. Deputy Zach Ruple responded to the call. When he arrived

on the scene, he and Debo decided to look inside Thomas' house. Deputy Ruple and Debo

3

both testified that the house looked empty, with the exception of a few items. They saw two urns: one green and one gray. Debo recognized both; the green urn held Pamela's ashes, and Thomas told him that he wanted his ashes to be held in the gray urn. They also saw a deep freezer with a burgundy sheet on top of it that was near the back door. Debo informed Deputy Ruple that Thomas was in a relationship with Simmons, so Deputy Ruple went to Simmons' mother's house to try to contact Simmons, but she was not there.

¶8. Later that day, Debo called Jeremy "Todd" Smith, Thomas' stepson through his marriage to Pamela. Debo informed him that he stopped by Thomas' house and saw that it had been "gutted." Debo also told Todd that his mom's urn was still there and that he needed to go pick it up. Todd arrived at Thomas' house that evening and found the front door wide open. He said there was nothing in the house, and he "knew something was really, really sketchy and funny because . . . it just felt wrong." He retrieved his mother's urn and then he left.

¶9. Thomas and Todd had a very close relationship. Todd even testified that he and Thomas were "best friends," and they would see each other and hang out every few days. However, at the time Todd received the call from Debo, Todd had not seen Thomas for a while because he had an issue with Thomas' relationship with Simmons. During trial, it was revealed that Todd's wife, Michelle Smith, used to do drugs with Simmons. Todd testified that one day, Thomas asked him to come over to help him do some work on his boat, and Todd brought his son with him. While Todd was working on the boat, he saw Simmons coming out of the house. Todd testified that he turned to Thomas and told him, "[S]he's tried

4

to ruin my family already. I strongly suggest you stay away from her. She's not good people. And if that's who you choose to hang out with, we won't be back. It's simple." Then Todd and his son left. Todd said that he tried to contact Thomas several times about retrieving his Mustang and other items that were still at Thomas' house; however, he could only get in touch with Simmons. He testified that "[i]t was like she was talking for Thomas all of the sudden." Simmons kept giving Todd different reasons why he could not talk to Thomas. Todd eventually went to Thomas' house and retrieved his Mustang, and Simmons' son, Christopher Briggs, took him the rest of his property.

¶10. On May 22, 2018, Debo decided to contact Kenneth Burns, Thomas' older brother. He asked Kenneth if he could come to Purvis because Thomas was missing, and Kenneth agreed. When Kenneth arrived, Debo and Jaybird walked over to Thomas' house. They all agreed that they would go inside Thomas' house together. They saw that the front door was open, and there was a speaker playing the radio. There was nothing in the house except some cleaning supplies, one urn, and the deep freezer with the burgundy blanket on top of it. Kenneth lifted the blanket and discovered that a padlock was on the freezer. They all thought that was strange, and Debo testified that "Thomas never kept a padlock" on the freezer. Jaybird went to retrieve a crowbar from his truck, and he gave it to Kenneth when he returned. Kenneth used the crowbar to pry open the freezer. Inside the freezer, they discovered Thomas' body. Jaybird then notified the police.

¶11. Investigator Jack Rayner, the lead investigator on the case, and several other law enforcement officers were dispatched to the scene. When they arrived, they observed the

body in the freezer and saw that Thomas was placed headfirst in the freezer. There were zip ties around his ankles and a belt around his legs. The officers secured the scene and contacted the crime scene unit for processing. Investigator Rayner testified that after consulting with the crime scene unit, investigators, and the sheriff, they determined that the best way to preserve the body would be to send the whole freezer to the crime lab.

¶12. Investigators learned that Simmons had been living with Thomas and telling people that she was selling his property because she and Thomas were moving to Texas. They also learned that she had been taking property to Andy Scott Hartfield's house. Accordingly, Simmons and Hartfield became persons of interest, and officers were sent to Hartfield's house to locate them. James "Flash" Simmons (Samantha Simmons' cousin) was also indicated as a person of interest. Upon arrival to Hartfield's house, officers came in contact with William Bryson, who informed them that he had been living at Hartfield's house. He admitted that Simmons and Hartfield had been dating and that she had been living with them. He also revealed that he had been to Thomas' house with Simmons and had helped her move items from there to Hartfield's house. After learning this information, Investigator Lance Emfinger obtained a search warrant for Hartfield's house. When they executed the search, investigators retrieved several items that belonged to Thomas. Later that day, Hartfield was located and arrested during a traffic stop, and his car was towed to the county "barn." Investigators found Thomas' safe and insurance cards in his car.

¶13. While investigators were still searching Hartfield's house, Simmons pulled up in a Mazda Tribute. She was taken into custody, and her car was towed to the county "barn."

6

Investigators found a key ring with her car keys and two other keys. They discovered that one of the keys fit the padlock that was found on the freezer. Investigator Rayner testified that he recovered keys from several other persons of interest and tested them on the padlock, but none of them worked. The only key that fit the padlock was in Simmons' possession. On the day that Investigator Rayner discovered this key, he filled out a return form indicating that he took her keys to her cell. He did not reveal to her that the key on her ring fit the padlock that was on the freezer. That same day, he listened to her phone call (using the jail's phone) with her mother and heard her saying, "[T]here's a certain set of keys that weren't supposed to be on there. He shouldn't have those keys."

¶14. Officers were also sent to Connor and Eleanor Covert's house after learning that Simmons' sons, Christopher and Calvin Briggs, were living there. Christopher had been best friends with Michael Smith, the eldest grandson of Connor and Eleanor Covert, since they were in the third grade. At some point, the Coverts had acquired legal guardianship over the Briggs boys because they "didn't have an optimal home life when they were living with [Simmons]."

¶15. At the Coverts' house, officers recovered Thomas' Dodge Challenger, which Christopher had been driving, and a substantial amount of Thomas' property at the Coverts' house. Connor testified that Samantha reached out to his wife, Eleanor, about selling "a bunch of stuff" because she was "known in [their] circle of friends to do a lot of garage sales [and] flea markets." Connor testified that he "saw [Simmons] there with a [Dodge] truck several times unloading" and he "would come home on a daily basis, and there would be

7

more and more and more stuff accumulating." Investigators arrested Christopher and learned that he and Michael helped Simmons move items from Thomas' house to the Coverts' house and Hartfield's house. After questioning, Christopher was released.

¶16. Officers also recovered some items from other witnesses who reached out to them during the investigation. One individual contacted them and claimed to have bought a shotgun and some tools at the Covert's house. A man named Andy Herrington informed them that he had purchased a boat, which was previously titled to Thomas, from Simmons and Christopher. Hartfield's daughter April also reached out to investigators about some items she recovered from her father's house after he was arrested. These items included Thomas' and Pamela's driver's licenses, social security cards, birth certificates, Wells Fargo cards, and Pamela's death certificate.

¶17. Investigator Rayner subpoenaed Simmons' phone records, which revealed that the last phone call she made to Thomas was on April 24, 2018. Two days later, it was revealed that Simmons had rented a storage unit at Tellus Self Storage. This was confirmed by a rental agreement and video surveillance recovered from Haley McCray, an employee at Tellus, who contacted officers after reading an article about Thomas' murder on Facebook. She informed them Simmons was looking for a storage unit with electricity, and she wanted assurances that no one would enter the unit, even for repairs. Simmons ultimately rented the storage unit, but she never stored any items there.

¶18. After receiving Thomas' Wells Fargo bank card, Investigator Rayner also obtained a subpoena for his bank records. The records showed that between April 25 and May 23,

2018, $3,609.11 had been spent from Thomas' account. The ending balance on May 23 was zero dollars. These purchases were made in Purvis, Hattiesburg, and the Coast. None of these purchases were made in Texas.

¶19. The State Medical Examiner's Office received the freezer on May 29, 2018. Inside, they found Thomas' body "curled in a ball" with frozen food. There were zip ties around his neck, wrists, and ankles. There was also a belt around his legs and a trash bag over his head. The autopsy revealed that Thomas died from either strangulation from the zip tie being around his neck or "environmental/positional asphyxia" from his being placed in a freezer with a bag over his head. Prior to the autopsy, the zip ties and the trash bag were removed and sent to the Mississippi Forensics Laboratory for DNA testing. The DNA expert had received samples from all of the suspects. No DNA was found on the trash bag; however, the results from the zip ties implicated only two individuals: Thomas and Simmons.

¶20. Simmons was initially charged with receiving stolen property, but after her DNA was found on the zip ties, she was also charged with first-degree murder. Hartfield, Flash, and Bryson were all charged with receiving stolen property.

¶21. Simmons pled not guilty to both counts, and her trial commenced on September 19, 2022. The State called eighteen witnesses during its case-in-chief. At the conclusion of the State's case-in-chief, Simmons moved for a directed verdict. The trial court denied her motion. Simmons did not call any witnesses. The Lamar County Circuit Court jury ultimately found Simmons guilty of receiving stolen property and first-degree murder. She was sentenced to serve twenty years in custody for receiving stolen property and life

imprisonment for first-degree murder. The trial court ordered these sentences to run consecutively. On October 3, 2022, Simmons filed a motion for judgment notwithstanding the verdict or for a new trial. The trial court denied that motion, and Simmons appealed.

**STANDARDS OF REVIEW**

¶22. Simmons challenges the sufficiency and weight of the evidence. Accordingly, we apply two separate standards of review. *Wilson v. State*, 936 So. 2d 357, 363 (¶16) (Miss. 2006) (citing *Hawthorne v. State*, 835 So. 2d 14, 21 (Miss. 2003)).

¶23. This Court reviews challenges to the sufficiency of the evidence under a de novo standard. *Turner v. State*, 291 So. 3d 376, 383 (¶20) (Miss. Ct. App. 2020). In considering whether the evidence is legally sufficient to sustain a conviction, we ask whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Garrett v. State*, 344 So. 3d 849, 851 (¶12) (Miss. 2022) (internal quotation mark omitted). "We view all of the evidence in the light most favorable to the prosecution, accept all the evidence supporting the verdict as true, and give the prosecution the benefit of all favorable inferences that reasonably may be drawn from the evidence." *Id*. "We will reverse and render if the facts and inferences favor the defendant with such force that reasonable jurors could not find him guilty beyond a reasonable doubt." *Melendez v. State*, 354 So. 3d 944, 952 (¶30) (Miss. Ct. App. 2023) (quoting *Smoots v. State*, 310 So. 3d 1184, 1189 (¶17) (Miss. Ct. App. 2020)). "However, we must affirm if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*.

¶24. Challenges to the weight of the evidence are reviewed under an abuse of discretion

10

standard. *Bowman v. State*, 360 So. 3d 977, 996 (¶69) (Miss. Ct. App. 2022). When reviewing a challenge to the weight of the evidence, "[o]ur role as [an] appellate court is to view the evidence in the light most favorable to the verdict and disturb the verdict only when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Eaton v. State*, 359 So. 3d 1081, 1086-87 (¶22) (Miss. 2023) (quoting *Little v. State*, 233 So. 3d 288, 289 (¶1) (Miss. 2017)).

## DISCUSSION

### I. Receiving Stolen Property

#### A. Sufficiency of the Evidence

¶25. Simmons argues that there was insufficient evidence to convict her of receiving stolen property. Relying on *Young v. State*, 908 So. 2d 819 (Miss. Ct. App. 2005), Simmons argues that the State's evidence only proved that she stole Thomas' property; therefore, she could not have been convicted of receiving stolen property. However, Mississippi law no longer supports this rationale. Shortly after *Young* was decided, the Legislature added the following subparts to Mississippi Code Annotated section 97-17-70(3):

> (a) Evidence that the person charged under this section stole the property that is the subject of the charge of receiving stolen property is not a defense to a charge under this section . . . .
> (b) Proof that a defendant stole the property that is the subject of a charge under this section shall be prima facie evidence that the defendant had knowledge that the property was stolen.

Miss. Code Ann. § 97-17-70(3) (Supp. 2007). This addition precludes Simmons from arguing that she could not be convicted of receiving stolen property. Thus, Simmons' argument fails.

11

¶26.   According to section 97-17-70(1) (Rev. 2014):

> A person commits the crime of receiving stolen property if he intentionally possesses, receives, retains or disposes of stolen property knowing that it has been stolen or having reasonable grounds to believe it has been stolen, unless the property is possessed, received, retained or disposed of with intent to restore it to the owner.

Therefore, to convict Simmons of receiving stolen property, the State carried the burden of proving beyond a reasonable doubt that Simmons (1) intentionally possessed, received, retained, or disposed of personal property, (2) stolen from someone else, (3) with knowledge or reasonable grounds to believe that it had been stolen. It is uncontested that the property was stolen; therefore, we will address the first and third elements.

¶27.   Regarding the first element, the investigators found some of Thomas' personal property in Simmons' possession. While Simmons was in custody, investigators obtained a search warrant for her purse and found Thomas and Pamela's State Farm insurance cards inside. The investigators also found a substantial amount of Thomas' property at Hartfield's house, where investigators learned Simmons had been staying. Investigator Emfinger testified that after obtaining a search warrant for Hartfield's house, officers found Thomas' Dodge Magnum and his Dodge Ram 1500. Numerous witnesses testified that they saw Simmons driving these vehicles. In addition to the cars, the investigators found several other items[1] that belonged to Thomas at Hartfield's house.

---

[1] Investigator Emfinger testified that officers retrieved:

> a red shop vac, a small 8 foot trailer, two garden sprayers, a floor heater, assorted bags of cloths, assorted pictures, assorted drills, a wire welder, a couch, two carpenter levels, a chair, a red Yamaha golf cart with chrome and black SS rims on it, a coffee table, grinder, cutting torch, dresser, driftwood

¶28. The investigators also found a substantial amount of Thomas' property at the Coverts' house. Connor Covert testified that Simmons brought items to their house "on a daily basis." He said that he "saw Samantha there with a truck several times unloading[.]" He said that he was "concerned with the amount of stuff that was building up," and at one point he had to tell her that she could no longer bring items to his house.

¶29. Additionally, multiple eyewitnesses testified that they saw Simmons and several other individuals packing and hauling off Thomas' personal property. This was confirmed by testimony from Hartfield, Bryson, Briggs, and Smith, who all revealed that Simmons instructed them to pack up everything at Thomas' house and take some to Hartfield's house and some to the Coverts' house. Hartfield also revealed that they took some of Thomas' property to the scrap yards and traded it for money.

¶30. Investigators also learned that Simmons sold Thomas' boat to Andy Herrington. He testified that Simmons and her son met him to sell the boat. When he saw that the name listed on the title registration was Thomas Burns and discovered that Thomas Burns was not present to sign the bill of sale, he asked if Simmons had permission to sell the boat. After making a phone call, Simmons told Herrington that she received permission from Thomas. She signed both her name and Thomas' name and transferred the title of Thomas' boat to Herrington in exchange for $4,200 cash. All this evidence indicates that Simmons

---

hat rack, a box of dishes and bowls, another Lincoln 225 arc welder, assorted keys, Troy-Bilt self-propelled mower. There was various other assorted tools there, as well. Two electric cutting saws, air compressor, a Dewalt saw, a battery charger, pressure washer, rope, a blue ladder, various garden tools, a Makita radio and a cast iron stove.

13

intentionally possessed, retained, and disposed of Thomas' personal property.

¶31. Regarding the third element, the State could prove Simmons' "guilty knowledge by adducing proof that [she] stole the property that [was] the subject of the receiving stolen property charge." *Wilson v. State*, 194 So. 3d 855, 861-62 (¶16) (Miss. 2016). As discussed above, the State provided substantial evidence to prove that Simmons stole Thomas' personal property and Simmons even concedes this in her brief. Evidence that she stole Thomas' property served as "prima facie evidence that the defendant had knowledge that the property was stolen." Miss. Code Ann. § 97-17-70(3)(b). Thus, the knowledge element was met.

¶32. Viewing the evidence in the light most favorable to the State, we find that a rational juror could have found beyond a reasonable doubt that the State proved that Simmons intentionally possessed property that she knew had been stolen from Thomas.

### B. Weight of the Evidence

¶33. Simmons alternatively argues that the verdict was contrary to the weight of the evidence because there was no evidence to support the finding that she received the stolen property from a third party. However, as previously discussed, there was a mountain of evidence presented by the State from which the jury could determine guilt beyond a reasonable doubt. Several eyewitnesses testified that they saw Simmons driving Thomas' cars and taking items from Thomas' house. Furthermore, the individuals who helped her move Thomas' property testified that she instructed them to remove his property and relocate it to Hartfield's house and the Coverts' house. One witness also testified that she sold Thomas' boat to him and transferred the title by forging Thomas' signature.

14

¶34. Viewing the evidence in the light most favorable to the verdict, we find that the jury's verdict was not so contrary to the overwhelming weight of the evidence that to allow it to stand would constitute an unconscionable injustice. The trial court did not abuse its discretion in denying the motion for a new trial.

## II.     First-Degree Murder Conviction

### A.     Sufficiency of the Evidence

¶35. Simmons also challenges the sufficiency of evidence supporting her first-degree murder conviction. Mississippi Code Annotated section 97-3-19(1)(a) defines first-degree murder as the following: "The killing of a human being without the authority of law by any means or in any manner . . . [w]hen done with deliberate design to effect the death of the person killed." Accordingly, to convict Simmons of first-degree murder, the State carried the burden of proving beyond a reasonable doubt that Simmons (1) killed Thomas (2) without the authority of law (3) but with the deliberate design to effect his death. Miss. Code Ann. § 97-3-19(1)(a).

¶36. Simmons takes issue with the first element. She contends that the "State's evidence only proves that [she] took advantage of Thomas' death, [but] the evidence does not support a conclusion, beyond a reasonable doubt, that [she] killed Thomas." However, after our review of the record, we find that the State presented copious evidence to prove that Simmons killed Thomas.

¶37. We acknowledge that the evidence in this case is circumstantial. However, "[d]irect evidence is unnecessary to support a conviction so long as sufficient circumstantial evidence

15

exists to establish guilt beyond a reasonable doubt." *Campbell v. State*, 798 So. 2d 524, 528 (¶12) (Miss. 2001) (quoting *Underwood v. State*, 708 So. 2d 18, 35 (¶49) (Miss. 1998)); *accord Nevels v. State*, 325 So. 3d 627, 631 (¶12) (Miss. 2021) ("[I]n all criminal cases, there is but one burden of proof—guilt beyond a reasonable doubt."). Here, sufficient circumstantial evidence existed to establish that Simmons was guilty beyond a reasonable doubt.

¶38. Investigators found Samantha in possession of the key to the padlock that was on the freezer that Thomas' body was discovered in. They tested several other keys that they recovered from other suspects, however, none of those keys worked. Simmons had the only key that fit the padlock.

¶39. Dr. Staci Turner, the state medical examiner, testified that "the evidence of injury [was] strangulation." When the examiners pulled his body out of the freezer and unthawed him, they found a plastic bag around his head and zip ties around his neck, wrists, and ankles. They examined the inside of his neck and found "hemorrhages in the muscles and the soft tissue." This indicated that "[Thomas] was alive at the time that the flex ties was applied to his neck." "Environmental/positional asphyxia" was also listed as a possible cause of death because if he was still alive when he was placed in a freezer with a bag over his head, he would not have been able to breathe. They also found that Thomas had "blunt force injuries . . . on his forehead and his knees, and he had some bruises or hemorrhages in his scalp."

¶40. Joseph Heflin, a DNA expert with the Mississippi Crime Laboratory, also testified that he swabbed the three zip ties that were found on Thomas' body. Heflin testified that the

swabs produced the DNA of only two individuals. Flash, Hartfield, and Bryson were excluded; however, Thomas and Simmons were not excluded as possible DNA donors with a probability of one to 10 billion. Simmons argues that her DNA on the zip ties is "inconclusive to prove that [she] was a principal actor" in Thomas' death. However, when discussing the details of his analysis, Helfin stated that "[t]here was a fair amount of DNA there from Samantha Simmons, which was surprising. Usually on this type of object, we don't see that much DNA from an individual who just handled these items." This testimony, coupled with the DNA evidence, could lead a reasonable juror to conclude that Simmons killed Thomas.

¶41. However, the State provided additional evidence that pointed to Simmons' guilt by demonstrating that Simmons was trying to cover up the murder. Several people inquired about Thomas after he disappeared and she continued to tell people that he had moved to Texas. However, investigators were not able to find any evidence to corroborate this alleged relocation. Furthermore, Kenneth and Todd testified that Thomas had no plans of moving to Texas. Additionally, Hartfield, Christopher, and Michael testified that when they were moving items out of Thomas' house, Simmons specifically told them not to move the freezer because she did not want them to find out that she was hiding Thomas' body in the freezer. Simmons also tried to rent a storage unit two days after her last phone call to Thomas. While looking at units, she made two distinctive requests: (1) the unit needed to have electricity and (2) no one could enter the unit. A jury could reasonably infer that she was planning to hide the freezer, which needed power to stay running, and she did not want anyone to discover the

17

freezer in the unit.

¶42. Accepting all evidence as true and favorable to the State, we find that a rational juror could have found that the State proved beyond a reasonable doubt that Simmons committed first-degree murder. Accordingly, this issue is without merit.

### B. Weight of the Evidence

¶43. Simmons also asserts that the trial court erred by denying her alternative motion for a new trial because her first-degree murder conviction is contrary to the weight of the evidence. We disagree.

¶44. Without repeating all the evidence previously discussed, the State presented ample evidence to prove that Simmons committed first-degree murder. Simmons chose not to testify, and she did not offer any witnesses to rebut the evidence presented by the State. Therefore, the jury only had the State's evidence and witnesses to consider, and it was ultimately up to them to decide Simmons' fate.

¶45. "It is well established that the jury determines matters of weight, credibility, and conflicting evidence." *Beasley v. State*, 362 So. 3d 112, 126 (¶50) (Miss. Ct. App. 2023) (citing *McCool v. State*, 328 So. 3d 173, 184-85 (¶47) (Miss. Ct. App. 2021)). "[W]e do not reweigh evidence. We do not assess the witnesses' credibility. And we do not resolve conflicts between evidence. Those decisions belong solely to the jury." *Little*, 233 So. 3d at 289 (¶1).

¶46. Here, we cannot say that the jury's verdict was so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.

18

We find that the trial court did not abuse its discretion in denying Simmons' alternative motion for a new trial.

## CONCLUSION

¶47. Based on our review of the record, Simmons' challenges to her receiving stolen property and first-degree murder convictions are unpersuasive. The evidence the State presented was sufficient to prove both counts. Also, the overwhelming weight of the evidence was not contrary to the jury's verdicts. The trial court properly denied Simmons' motion for judgment notwithstanding the verdict or for a new trial. Accordingly, we affirm Simmons' convictions and sentences.

¶48. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, McDONALD, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.**